Nancy A. **MAXWELL,** individually and d/b/a Maxwell Nursing Home on her own behalf and on behalf of all other similarly situated proprietors of private proprietary nursing homes in New York State, Appellant,

v.

George K. **WYMAN,** as Commissioner of the New York State Department of Social Services, et al., Appellees.

No. 625, Docket 71-2202.

United States Court of Appeals, Second Circuit.

Argued March 3, 1972.

Decided April 3, 1972.

Lewis A. Aronowitz and Cornelius Murray, (O'Connell & Aronowitz, Albany, N. Y.), for appellant.

James H. Sweeney, Deputy Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., State of N. Y., Ruth Kessler Toch, Sol. Gen., Douglas S. Dales, Jr., Asst. Atty. Gen., on the brief), for appellees Wyman and Ingraham.

James S. Cullum, Asst. U. S. Atty. (James M. Sullivan, Jr., U. S. Atty. for the N. D. of N. Y., on the brief), for appellee Richardson.

Hoffinger & Stuart, Jack S. Hoffinger and Harvey Stuart, New York City, for amicus curiae, Metropolitan New York Nursing Home Association.

Before MURRAH,* KAUFMAN and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Appellants, 148 proprietors of "skilled nursing homes" which care for 5,000 elderly patients in New York State, appeal from the denial of a preliminary injunction by the United States District Court for the Northern District of New York. This appeal was certified by Judge Port under 28 U.S.C. § 1292(b) and taken under 28 U.S.C. § 1292(a) (1). The injunction was sought to prevent the New York Departments of Social Services and Health and the United States Department of Health, Education and Welfare (HEW) from terminating without a hearing appellants' participation in the New York Medicaid program and their rights to Medicaid reimbursement. For rendering skilled nursing care to eligible patients appellants have been reimbursed in part by federal funds pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.

Title XIX is administered in each state by a "single State agency," 42 U.S.C. § 1396a(a) (5), in New York the Department of Social Services. Social Services has in the past executed a so-called "provider agreement" with each nursing home, pursuant to 42 U.S.C. § 1396a(a) (27), under which the home agrees to keep records and furnish information regarding payments claimed for providing services. To qualify for reimbursement, a nursing home must have a state operating certificate and must meet federal requirements as a "skilled nursing home." 18 N.Y.C.R.R. § 505.9(a). A state operating certificate is obtained from the Department of Health and cannot be "revoked, suspended, limited or annulled without a hearing." N.Y.Pub. Health Law § 2806(2) (McKinney 1971).

Appellees contend that appellants' state operating certificates are intact and not in question here. Appellants on the other hand argue that their state operating certificates will be "limited" if not "annulled" if the homes are ineligible for reimbursement under the federal scheme. Appellants contend that they will be driven out of business in a matter of weeks if they receive no reimbursement for the 75 per cent of their patients who are Medicaid recipients.

We turn then to the complex federal statutory and regulatory scheme to see what has occurred to appellants. Because New York does not have a fire and safety code approved by HEW, to qualify for a "provider agreement" after December 31, 1969, each skilled nursing home in the state must conform with relevant provisions of the Life Safety Code of the National Fire Protection Association (1967 ed.) 42 U.S.C. § 1396a(a) (28) (F) (i); 45 C.F.R. § 249.33(a) (1) (vii). The state agency may, however, waive

. . . in accordance with regulations of [the Secretary of HEW], for such periods as it deems appropriate, specific provisions of such code which, if rigidly applied, would result in unreasonable hardship upon a nursing home, but only if such agency makes a determination (and keeps a written record setting forth the basis of such determination) that such waiver will not adversely affect the health and safety of the patients of such skilled nursing home. . . .

42 U.S.C. § 1396a(a) (28) (F) (i); 45 C.F.R. § 249.33(a) (1) (vii). The provisions of the Life Safety Code are numerous, explicit and restrictive, e. g., "Institutional buildings 2 stories or more in height shall be constructed of at least 2-hour fire-resistive construction." Chapter 10, subsection 10–1322.

We do not know in what specific respects appellants do not comply with this Code. On the basis of representations made on oral argument we assume that

---

* Senior Judge of the Tenth Circuit Court of Appeals, sitting by designation.

some appellants can comply with the Code and some cannot. But none has had a hearing of any kind before any state or federal agency regarding compliance with the Code. The state agency (Social Services) has refused to waive compliance, even though the federal statute and regulations permit it, because it refuses to make the necessary "determination . . . that such waiver will not adversely affect the health and safety of the patients . . .." This is done, as we gather it, not by examination of appellants on a case-to-case basis,[1] but apparently because the state agency believes that, under the federal statute and regulations, any failure to comply with the Life Safety Code necessarily will affect the safety of the patients adversely. Thus appellants, and more to the point, appellants' patients—many of whom might be forced into nursing homes outside the state of New York were appellants forced to close down— are victims of a rather wondrous bureaucratic shell game, in which a waiver of compliance is permitted by the federal agency, but the state agency says that it cannot issue a waiver under any circumstances—now you see it, now you don't.[2]

The district court denied injunctive relief against HEW, because before the Secretary may terminate payments to the State he must give the state agency ". . . reasonable notice and opportunity for hearing . . .." 42 U.S.C. § 1396c; see 45 C.F.R. § 213.1 et seq. Hearings adverse to the State are subject to judicial review under 42 U.S.C. § 1316 (a) (3) and under the general review provisions of 5 U.S.C. § 701 et seq.; see 42 C.F.R. § 213.32(d). We affirm this portion of the order below, both because the application as to the federal appellee is premature and because there is no relationship between appellants and HEW.

The district court also denied injunctive relief against the two state departments involved, although it assumed a likelihood of success insofar as a right to hearings is concerned.[3] Its ground

---

1. In reference to appellant Maxwell, however, the specific respects in which her home failed to comply were set forth in detail in a letter from the Department of Health dated July 26, 1971. These included, e. g., "[n]on-fire resistive multistory wood frame structure," "[u]nacceptable fire detection and alarm system," and "[l]ack of suitable automatic fire protection in hazardous areas." Appellant Maxwell replied by letter dated August 17, 1971, spelling out the details of her sprinkler and fire detection system, means of egress from the home, fire drill procedures, and requesting a hearing.

2. Surveys of the homes involved in this action were made prior to January 1971 by the Department of Health. As a result of the surveys the Department of Social Services entered into six-month agreements with the homes under 45 C.F.R. § 249.33(b) (9), refusing to enter 12-month agreements because of allegedly non-fire resistant structures. The State says it did so only on the basis of the then relevant "community need standard" of 20 C.F.R. § 405.1134 incorporated by reference in 45 C.F.R. § 249.33(b) (9). These agreements were renewed for a second six months, ending December 31, 1971, and have not been renewed. During the second six-month agreement, HEW removed the "community need" clause of 20 F.C.R. § 405.1134 by 36 Fed.Reg. 20676 (1971) and thus from the Title XIX certification program of 49 C.F.R. § 249.33. We do not agree with the State, however, that, because of the elimination of the "community need" standard, it can no longer issue waivers.

3. The district court felt that the "likelihood of success of the plaintiff is in a distinctly grey area," referring to Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Cafeteria and Restaurant Workers Union Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Birnbaum v. Trussell, 371 F.2d 672 (2d Cir. 1966), among other cases.

Presumably the "area" will be somewhat less "grey" when the Supreme Court renders its decision in the trilogy of cases which were argued in January 1972. See Lynch v. Household Fin. Corp., 318 F. Supp. 1111 (D.Conn.1970), prob. juris. noted, 401 U.S. 935, 91 S.Ct. 962, 28 L.Ed.2d 214 (1971) (Civil Rights Act, 42 U.S.C. § 1983, challenge to prejudgment garnishment statutes); Fuentes v. Faircloth, 317 F.Supp. 954 (S.D.Fla.1970), prob. juris noted, 401 U.S. 906, 91 S.Ct.

for denial was that appellants will not be irreparably harmed. If appellants (or any of them individually) lose on the merits, the court reasoned, the decision not to provide funds prior to hearings will be vindicated. If, the court went on to say, appellants prevail on the hearings —either because homes are ". . . without deficiencies or because the deficiencies may be waived . . ."—they would be entitled to a "so called '12 month' agreement . . . effective from January 1, 1972 voluntarily . . or by order of the court."[4] The court concluded that, except for the legal question whether appellants are entitled to a hearing, ". . . this seems to be a policy problem, the solution of which appropriately lies within the province of the defendants."

We disagree with the district court's view on this phase of the case because,

as argument revealed, the State takes the blanket position that it cannot waive *any* failure to comply with the Life Safety Code, since such a failure necessarily adversely affects the safety of the patients. In doing so, the State, we think, misreads the federal regulations. In the case of each nursing home the state agency should, as we read 45 C.F.R. § 249.33(c) (2), determine whether failure to waive relevant Life Safety Code provisions would result in "unreasonable hardship" for the home. If such hardship would result, and if the waiver would not affect the patients' health and safety adversely, waiver is permissible.[5] Moreover, HEW itself considers that construction standards of the Life Safety Code may be waived by the single state agency in individual cases.[6]

The question is whether, pending such individual determination, preliminary in-

---

893, 27 L.Ed.2d 804 (1971) (similar challenge to prejudgment replevin statute); Swarb v. Lennox, 314 F.Supp. 1091 (E.D. Pa.1970), prob. juris. noted, 401 U.S. 991, 91 S.Ct. 1220, 28 L.Ed.2d 529 (1971). *See generally* Note, Another and Hopefully Final Look at the Property-Personal Liberty Distinction of Section 1343(3), 24 Vand.L.Rev. 990 (1971).

4. By a "12 month" agreement the court is presumably referring to the usual provider agreement which runs from year to year. This is to be distinguished from the six-month agreements, only two of which may be entered into even though deficiencies exist. 45 C.F.R. §§ 249.33(a) (2) (iv) (a) (1), (2), (3). Here, two consecutive six-month agreements were entered into with the nursing homes in 1971, the maximum allowed by subdivision (3) of the regulation cited above. This waiver provision is different from the main one under consideration here, 45 C.F.R. § 249.33 (c) (2).

5. The regulations also include a provision permitting waiver "[w]here structural changes in the facility are necessary to meet a provision, the change is of such magnitude as to be infeasible, or economically impracticable; delay in making such changes would not adversely affect the health and safety of patients; and an explanation of this finding is maintained on file . . . ." 45 C.F.R. § 249.33 (c) (2) (iii). In the case of appellants' homes which are not of "at least 2-hour

fire-resistive construction" as required by the Life Safety Code, Chapter 10, subsection 10-1322, the State says that the homes were "without the ability to make changes which would provide for equivalent protection to patient life and safety."

No home has been given the opportunity to contest this finding. The Life Safety Code itself has a grandfather clause permitting—in the cases of pre-existing homes such as appellants'—modification of the Code requirements "by the authority having jurisdiction to allow alternative arrangements that will secure as nearly equivalent safety to life from fire as practical; but in no case shall the modification be less restrictive or afford less safety than compliance with the corresponding provision contained in the following part of this Code." Subsection 10-2122. We do not pass upon the meaning of this provision, but, somewhat like the main regulations under consideration here, the left hand appeareth to take away what the right hand hath given. It is apparent that the regulations and Life Safety Code together constitute a Hall of Mirrors. He who enters it does so at the peril of being lost.

6. A letter from HEW to the American Nursing Home dated February 29, 1972, and furnished to the court, reads in part as follows:

In interpreting this provision it must be noted first that the Life Safety Code does not permit buildings of one-hour

junctive relief should be granted. Is there a reasonable likelihood of success on the merits? Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2d Cir. 1966). Would there be irreparable harm to appellants if such relief were not granted?

The statutory argument may very well succeed, because for all practical purposes ineligibility for a "provider agreement" may make the state operating certificate, concededly still outstanding, useless.[7] In a real sense the certificate is being "limited." This is true although the homes may still treat private patients. It is true although the homes may apparently continue to receive state and federal aid as "Intermediate Care Facilities" under 42 U.S.C. § 1396d(c);[8] interestingly, we are informed by HEW's brief that the Secretary has not yet promulgated regulations setting federal standards pertaining to health and safety, etc., for patients requiring only "intermediate care." Parenthetically, it will be recalled that when a certificate is "limited," a hearing is required under N.Y.Pub.Health Law § 2806(2) (McKinney 1971).[9]

Despite the possible receipt of state and federal aid as "Intermediate Care Facilities" and the ability to retain approximately 1,700[10] private patients, the inability to care for Medicaid patients will be costly to appellants and will require the discharge of trained personnel. That the public interest is also seriously affected is of no small concern to us. Neither state nor federal appellees dispute the proposition that there are presently no facilities in the state of New York to provide skilled nursing care for the patients now treated by appellants; how these patients would be cared for does not appear.

We must, of course, also consider the possibility of harm to appellees, and the patients whose interests they are, after all, seeking to protect by promulgating high safety standards. In this regard there is a possibility that harm will accrue to the State if HEW cuts off its reimbursement funds for state noncompliance. Since the federal statute and regu-

protected wood-frame construction or one-hour protected ordinary construction more than one story in height. Thus, a facility which met the construction requirements of the Code would not have a level above the ground floor. However, the regulations provide that requirements of the Code may be waived in certain circumstances in individual cases by the single State agency in the case of Medicaid or the Social Security Administration in the case of Medicare. If the construction standard is waived with respect to a facility of one of these construction types with more than one story and the facility is sprinklered in accordance with Section 10–234 of the Code, then blind, nonambulatory and physically handicapped patients may be housed above the street level floor.

7. Because we find that appellants may succeed on their statutory argument, we do not consider the merits of their claim that they are constitutionally entitled to a hearing under Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

8. As such they could receive up to 60 per cent of the maximum allowable costs payable for a patient in a skilled nursing home. However, they would probably have to discharge the trained staff necessary to care for bedridden or other patients demanding "skilled" home care, and the difference between 100 per cent and 60 per cent is not inconsiderable.

9. The State asks us to abstain from ruling on such rights and to require appellants to proceed under State law. But here a very real time element is involved. If, after hearing, there is found to be no ground for issuance of a waiver, then patients are being cared for in homes in which there are outstanding federal and state administrative findings that their safety is affected adversely. In such a case delay is a factor that alone justifies non-abstention. Cf. Zwickler v. Koota, 389 U.S. 241, 252, 88 S.Ct. 391, 19 L.Ed. 2d 444 (1967): "To force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." See also Garvin v. Rosenau, 455 F.2d 233 (6th Cir. 1972).

10. There are 5,000 elderly patients now eligible for Medicaid who, as we have said, constitute 75 percent of appellants' caseload.

lations are not easy to interpret and, as noted above, have in fact been misinterpreted by the State, and since oral argument disclosed that many states presently are not seeking in any way to enforce the federal standards, we assume the HEW procedures will have sufficient flexibility to allow the State to afford appellants hearings if it does so on an accelerated basis.

Insofar as harm to the State is concerned, the State's position is essentially that it will afford hearings so long as it does not lose federal funds. Since the State is entitled to notice and hearing before federal funds are cut off, 42 U.S. C. § 1396c; 45 C.F.R. § 213.1 et seq., we need not cross this bridge now.

Lest it be thought that in granting preliminary relief, the court is giving nursing home proprietors a carte blanche to avoid safety regulations and endanger patients, it should be pointed out that these homes have been operating under provider agreements and temporary waivers for some time, and it is only by virtue of a change in the federal regulations that appellants have come under the State's guns. Appellant Maxwell, for example, had a statement as of August 1971 from the Health Department that "This facility, though it is a two story wood frame, non-fire resistence [sic] structure, provides a safe and comfortable environment." Social Services, familiar with the status of each appellant, can easily schedule its hearings on an expedited priority basis, hearing those cases in which there are strong potential hazards first, those in which the danger is little or none later. Under 45 C.F.R. § 249.33(c) (2) (iii), the state agency may, of course, set any conditions on waivers for the 31 or so homes we are told are engaged in major structural changes which will bring them into compliance with the Life Safety Code.

We therefore reverse and direct the granting of a preliminary injunction against the state departments, restraining them from terminating medical reimbursement to appellants until a hearing has been afforded on the question whether waiver will be permitted under the applicable federal regulations as we have construed them. These hearings shall be held as quickly as possible, the State to determine the order in which they will be held.

■ One additional procedural problem remains. We have throughout this opinion treated appellants as a class, although the district court's opinion does not expressly do so. This is entirely appropriate under Fed.R.Civ.P. 23 and Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968), and appellees do not object to it. The question, however, is whether that class should be extended to include voluntary nursing homes, public nonproprietary nursing homes [which are administered by the New York State Department of Health under N.Y.Pub. Health Law §§ 201, 2903, 2906 (McKinney 1971)] and mental hygiene facilities. For purposes of this appeal we think not, since there has been no demonstration that appellants here can "fairly and adequately protect the interests" of voluntary or public nursing homes or mental hygiene facilities. Fed.R.Civ.P. 23 (a) (4). Moreover, as to the State's own homes, the State would appear to be in a difficult situation—perhaps the Health Department would have to hold a hearing to determine whether to grant itself a waiver so as to maintain eligibility for HEW funds. We do not think it appropriate to treat these issues on this appeal. Fully realizing that there may here be a Pandora's box, we leave to the district court the task of determining whether to expand appellants' class in any respect. We continue the stay against appellee HEW insofar as it applies to reimbursement to public nursing homes and mental hygiene facilities until the district court has made the necessary determination.

Judgment in accordance with opinion.