**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al.**
**and**
**Patricia Parisi, by her mother Lena Steuernagel, et al., Plaintiffs,**

**v.**

**Nelson A. ROCKEFELLER, Individually and as Governor of the State of New York, et al., Defendants.**

**Nos. 73–C–55, 73–C–113.**

United States District Court,
E. D. New York.

April 10, 1973.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, by Brenda Soloff, Judith Gordon, Asst. Attys. Gen., for defendants; and Judith T. Kramer, Deputy Asst. Atty. Gen., of counsel.

Bruce J. Ennis and Burt Neuborne, New York Civil Liberties Union, New York City, Julian Tepper, Stanley Herr, ton, D. C., Charles R. Halpern, Eugene Z. DuBose, Mental Health Law Project, Washington, D. C., for plaintiffs in case No. 72–C–356.

Kalman Finkel, John E. Kirklin, Anita Fisher Barrett, Legal Aid Society, Civil Appeals Bureau, New York City, Robert L. Feldt, Legal Aid Society, Staten Island, N. Y., for plaintiffs in case No. 72–C–357.

Leonard B. Pack, New York City, for American Association on Mental Deficiency, New York City Chapter of the National Association of Social Workers, Federation of Parents Organizations for the New York State Mental Institutions, and New York State Federation of Chapters of the Council for Exceptional Children, amici curiae for plaintiffs.

JUDD, District Judge.

## MEMORANDUM

Willowbrook State School for the Mentally Retarded has been characterized by Dr. Herbert J. Grossman, expert consultant for the defendants, as "based on the wrong concept in the wrong place with the wrong plan." Plaintiffs, repre-senting the residents of Willowbrook, have asked this court to require the defendants to institute programs which will raise the conditions at Willowbrook to a level approaching the ideals stated in recently formulated national accreditation standards. The official defendants question the power of a federal court and also the necessity of any action, in the light of the efforts which are currently being made to improve the conditions at Willowbrook.

The present state of the case requires the court's decision on a motion for a preliminary injunction, after a week of hearings. A federal court, as will appear, cannot grant relief to the extent requested by the plaintiffs.

Dr. Grossman in the final affidavit submitted by the defendants stated that "from a professional point of view, improvement is necessary in every aspect of care and in every building which I visited." However, he identified overcrowding as the most critical problem, and endorsed the plans of the Department of Mental Hygiene as a logical and systematic way to deal with problems which "are longstanding and enormously complex."

### Summary of Facts

From the testimony received at five days of hearings, a sheaf of exhibits, a folder of photographs, and hundreds of pages of affidavits considered as part of the record, plus this court's visit to the Willowbrook State School for the Mentally Retarded, it appears and the court finds that:

Willowbrook consists of approximately 43 buildings with a resident population of 4,727 on December 10, 1972, reduced from a high of 6,200 in 1969 and from a total population of approximately 5,700 at the beginning of this action. Over three-quarters of the residents are profoundly or severely retarded with intelligence quotients below 35, approximately one-third suffer from epileptic seizures, and over half have been in Willowbrook over 20 years.

In spite of legislative reports dating from 1964, which complained of overcrowding and inadequate staffing at Willowbrook, conditions are still inhumane. The institution has not yet recovered from a hiring freeze which prevented even the replacement of departing staff members from December 1970 until November 1971 and prevented the hiring of any additional staff until January 1972.

Only 27 per cent of the residents at Willowbrook are there on voluntary application. These are not treated any differently from those who are there under court order. Even those who are there on voluntary application (usually of their parents or guardians) have no other place to go.

Testimony of ten parents, plus affidavits of others, showed failure to protect the physical safety of their children, and deterioration rather than improvement after they were placed in Willowbrook School. The loss of an eye, the breaking of teeth, the loss of part of an ear bitten off by another resident, and frequent bruises and scalp wounds were typical of the testimony. During eight months of 1972 there were over 1,300 reported incidents of injury, patient assaults, or patient fights.

The number of ward attendants is below the level which even the Director of Willowbrook thinks proper, and unauthorized absences worsen the shortage. There are only half the number of doctors that are needed, and nurses, physical therapists, recreation therapists, and other professional staff are in short supply. For many of the professional groups, the salaries offered are not competitive with those available in other more desirable places of employment in the community. The turnover of present staff is almost 40 per cent a year for ward attendants and 18 per cent a year for the rest of the staff.

Physical maintenance is poor, with a backlog of 750 work orders and at least one toilet inoperative in every battery of toilets.

These conditions are hazardous to the health, safety, and sanity of the residents. They do not conform with the standards published by the American Association on Mental Deficiency in 1964, or with the proposed standards published on March 5, 1973 by the United States Department of Health, Education and Welfare. A most striking deficiency is the inadequate coverage of dayrooms, where the ratio is frequently 15 or more residents per attendant on duty even for profoundly or severely retarded residents.

Over three-fourths of the residents of Willowbrook are profoundly or severely retarded, and would require resident care personnel in the ratio of 1:5 for the first shift, 1:7 for the second shift, and 1:15 for the third shift, to comply with the 1964 A.A.M.D. Standards.

More detailed standards, set forth as optimum goals, were prepared in 1971 by the Accreditation Council for Facilities for the Mentally Retarded (A.C.F. M.R. Standards), but at the time of the hearings only one facility had been accredited as meeting these standards.

Defendants have taken significant steps during 1972, by closing admissions to Willowbrook, by appointing a qualified new Director and a highly experienced new Deputy Director for Institutional Administration, by creating a ward service career ladder, and by plans to subdivide the institution into manageable units, among other things. These steps have been inadequate, however, to assure the safety of the residents up to the present time. Efforts to reduce the population and to increase the staff are continuing, but the number of new professionals hired during 1972 has been minimal, largely because of the inadequacy of salaries in relation to the problems facing the staff.

The Legislature has now provided additional funds, and the Director and Deputy Director have been assured that there will be money to pay for anyone that they can hire and to purchase a

reasonable amount of necessary equipment.

Approximately half the budget of Willowbrook is reimbursed by the United States Department of Health, Education and Welfare, which rates Willowbrook as an intermediate care institution.

### Requests for Relief

In their post-trial memorandum, plaintiffs suggest 26 appropriate forms of relief:

1. Immediate steps to employ 134 more nurses, 125 mid-level supervisors, 25 more maintenance workers, and more personnel employees.

2. Employment of enough attendants within 30 days to provide at least one for every 10 residents during the first and second shifts.

3. Immediate steps to employ enough attendants (after 30 days) to have one for every 8 or 9 residents on the first and second shifts.

4. Notices to forbid the use of seclusion.

5. Preparation of evacuation plans and conducting a fire drill within 30 days.

6. Subsequent employment of enough attendants to assure a 3-shift ratio of 1:6, 1:6, and 1:12.

7. Steps to recruit a total of 422 English speaking nurses.

8. Immediate steps to recruit a physical therapy staff of 50 to 60 persons.

9. All steps necessary to hire an additional 21 full-time M.D. physicians.

10. Immediate steps to develop an orientation program for resident-care attendants.

11. Immediate steps to assign named residents to named resident-care attendants.

12. Immediate steps to subdivide large dayroom areas into smaller sections.

13. Immediate steps to make maximum use of presently unused space.

14. Repair of all defective toilets, health and safety hazards, etc.

15. Immediate provision of adequate cleaning equipment, etc.

16. Immediate steps to hire sufficient maintenance personnel.

17. All steps necessary to eliminate improper physical and chemical restraints.

18. All steps necessary to eliminate cockroaches, rodents, and other pests.

19. All steps necessary to provide adequate clothing and bedding.

20. All steps necessary to provide adequate toilet and personal hygiene supplies.

21. Immediate steps to provide regular outdoor exercise.

22. Immediate steps to initiate completion of medical screening of all residents by July 31, 1973.

23. Immediate steps to contract for acute medical and surgical services from a fully accredited hospital within 60 days.

24. In the alternative, immediate steps to implement each of the recommendations of Dr. Clements and Dr. Roos.

25. Immediate submission to the Legislature of a supplemental budget request, if necessary.

26. Direction to request any necessary exemptions from the state Civil Service law in respect of salary levels, fringe benefits, and recruitment.

### Discussion

Plaintiffs ground their claim on a constitutional right to treatment, which would require the court to impose a large portion of the A.C.F.M.R. Standards upon the defendants.

Defendants dispute the jurisdiction of the federal court, assert that relief is barred by the Eleventh Amendment, and that in any event, the facts do not justify the issuance of a preliminary injunction. They further ask the court to abstain, even if it has jurisdiction, in def-

erence to the efforts which they are making to remedy any existing deficiencies.

The court concludes (a) that the plaintiffs' class has no constitutional right to treatment either independently or on due process or equal protection grounds, but (b) that they have a right to reasonable protection from harm; that appropriate relief is not barred (c) by the Eleventh Amendment or (d) by any duty of abstention, and (e) that the court should give specific directions to prevent seclusion and to effect, among other things, a prompt increase in the number of ward attendants, doctors, nurses, physical therapists and recreation therapists, with salary limits fixed by the court if those offered by the defendants are inadequate to attract the necessary staff.

### (a) The Right to Treatment

Of the many complex issues of law presented, the most difficult involves the newly developing "right to treatment," its scope, and the extent to which it embodies a federal constitutional principle.

The right to treatment as a constitutional concept has its beginnings in Judge Bazelon's opinion in Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F. 2d 451 (1966), though it was really announced only as a statutory right.

Prior to Rouse v. Cameron, *supra*, dicta in two D.C.Court of Appeals opinions touched on a constitutional right to treatment. In Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960), a habeas corpus proceeding by a mental patient, Judge Fahy (concurring) questioned a statement by the majority that it was permissible to confine a person acquitted by reason of insanity for a period considerably in excess of the possible penalty for the crime charged. He thought that the mandatory commitment provision would run afoul of the due process clause unless qualified by an obligation for treatment of the mental condition which led to the acquittal. To fail to provide treatment would transform the hospital into a penitentiary where one could be held indefinitely for no convicted offense.

. . .

281 F.2d at 950. Ragsdale, after a charge of robbery, and acquittal because of insanity, had escaped from confinement in St. Elizabeth's Hospital. He brought his petition shortly after he had been returned to the hospital as a fugitive. There was some evidence that he was still mentally ill and Judge (now Chief Justice) Burger in the majority opinion (281 F.2d at 947) held that reasonable medical doubts should be resolved in favor of the public.

Judge Bazelon, in Darnell v. Cameron, 121 U.S.App.D.C. 58, 348 F.2d 64 (1965), like *Ragsdale* an appeal from the denial of a petition for habeas corpus by an inmate of St. Elizabeth's Hospital, noted (pp. 67–68) that the petitioner had received little treatment although he had been confined for more than four years after acquittal by reason of insanity of a charge with only a possible one-year sentence. Darnell had been originally convicted of indecent exposure, and was returned to the hospital after being released on parole and arrested again for a similar offense. The precise holding was that he was entitled to a hearing on the revocation of parole, but Judge Bazelon suggested that the hearing on remand should also consider the issue of treatment, in order to meet the question of the constitutionality of the mandatory commitment statute.

Armed with the *Ragsdale* and *Darnell* cases, and supported by a law review article entitled The Right to Treatment, 46 A.B.A.J. 499 (1960) by Dr. Morton Birnbaum, Judge Bazelon again considered the right to treatment in the seminal case of Rouse v. Cameron, cited above, 373 F.2d 451. *Rouse* is important because all the recent cases supporting a constitutional right to treatment are traceable to it.

As the touchstone for the constitutional right to treatment, *Rouse* merits scrutiny. Procedurally, *Rouse*, like

*Ragsdale,* was an appeal from the denial of a habeas corpus petition. The petitioner was confined in St. Elizabeth's Hospital after acquittal, by reason of insanity, of a misdemeanor. The lower court judge refused to consider the claim that petitioner had not received adequate treatment, stating that his jurisdiction on habeas corpus was limited to a consideration of whether petitioner had regained his sanity. The Court of Appeals reversed and remanded for a hearing and findings on the adequacy of treatment. Judge Bazelon's majority opinion notes (373 F.2d at 453) that civil confinement without treatment might draw into question the constitutionality of the statute requiring commitment in all cases where criminal defendants are acquitted by reason of insanity. He cited three bases of possible constitutional violation (*ibid.*): (1) that summary commitment, without a finding of present incapacity, might violate procedural due process in the absence of treatment, being justified only "because of its humane therapeutic goals"; (2) that a person convicted of a crime could be sentenced to prison only for a finite period, while a person acquitted by reason of insanity might be confined indefinitely; and (3) that indefinite confinement without treatment of one who is not criminally responsible may be so inhumane as to violate the Eighth Amendment's proscription of cruel and unusual punishment.

These constitutional issues were not, however, the basis of decision. Rather the court decided that Congress had established a statutory right to treatment by its enactment of the 1964 Hospitalization of the Mentally Ill Act. D.C. Code § 21–562. Although Judge Bazelon suggested that the constitutional problem discussed in the opinion motivated Congress to pass the law, he based his decision on the statute, saying (373 F.2d at 455):

> Because we hold that the right to treatment provision applies to appellant, we need not resolve the serious constitutional questions that Congress avoided by prescribing this right.

On remand, the district court found that *Rouse* was receiving adequate treatment, but the Court of Appeals reversed for errors in the original commitment, without reaching the treatment issue. 128 U.S.App.D.C. 283, 387 F.2d 241 (1967).

Rouse v. Cameron is noteworthy in other respects in relation to the right to treatment. First, the court suggests methods by which a judge can weigh the adequacy of treatment, including (373 F.2d at 456) periodic assessments of each individual's needs and progress. Second, the court states (373 F.2d at 458) that the alternative to providing adequate treatment is release. In this second respect, the decision applies the rule of Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), that mere status (Robinson was a narcotic addict) does not justify imprisonment in the absence of treatment to remedy the condition. *Cf.* United States ex rel. Schuster v. Herold, 410 F. 2d 1071 (2d Cir. 1969).

The proposition that the *quid pro quo* for commitment in lieu of criminal incarceration must be treatment is not really radical. Expanding that proposition, however, to a constitutional right of habilitation owed by the State of New York to mentally retarded children resident at Willowbrook is more than the next logical step in an inexorable sequence. At the outset, there is a difference in the nature of the commitment. In *Rouse,* the commitment of persons acquitted by reason of insanity was not only involuntary but mandatory. On the other hand, a large part of the residents of Willowbrook entered because they had no alternative, and none have been denied a right to release. There is a significant difference between the state requiring commitment as an alternative to criminal incarceration and the state providing a residence for the mentally retarded. The residents of Willowbrook are for the most part incapable of exist-

ing independently unless successfully habilitated. See Murdock, Civil Rights of the Mentally Retarded: Some Critical Issues, 48 Notre Dame Lawyer, 133, 160 (1971). Moreover, there is a great difference between a federal judge giving directions about care in a federal hospital, involving no federal-state relations, and a federal judge radically restructuring New York's treatment of mentally retarded children.

Recent cases have expanded the purview of the right to treatment, without analyzing the basis for Rouse v. Cameron. In Wyatt v. Stickney, D.C., 325 F. Supp. 781 (1971), Judge Frank Johnson's case in the Middle District of Alabama, the initial challenge was to the conditions to which all involuntarily committed mental patients in state hospitals were subjected. Later the case was expanded to include the mentally retarded committed to a state school. Judge Johnson relied on the D.C.Circuit cases. He did not elaborate on the constitutional underpinnings but rather accepted Judge Bazelon's due process theory as self-evident, saying in 325 F.Supp. at 784:

> Adequate and effective treatment is constitutionally required because, absent treatment, the hospital is transformed "into a penitentiary where one could be held indefinitely for no convicted offense." Ragsdale v. Overholser, 108 U.S.App.D.C. 308 [315], 281 F.2d 943, 950 (1960). The purpose of involuntary hospitalization for treatment purposes is *treatment* and not mere custodial care or punishment. This is the only justification, from a constitutional standpoint, that allows civil commitments to mental institutions. . . . (Emphasis from original).

When Judge Johnson later held that the right was applicable to the residents of the Partlow State School and Hospital, he stated (344 F.Supp. 373, 390), that the legal principles, "clear beyond cavil," supported plaintiff's position that

people involuntarily committed through noncriminal procedures to institutions for the mentally retarded have a constitutional right to receive such individual habilitation as will give each of them a realistic opportunity to lead a more useful and meaningful life and to return to society.

His use of the word "habilitation" represented a step beyond his earlier opinion on the mental hospitals, where he had found only a right to "individual treatment." 325 F.Supp. at 784. Judge Johnson ordered compliance at the Partlow School with some 49 paragraphs of standards, including staff ratios based largely on the A.C.F.M.R. Standards. 344 F.Supp. at 395–407. The defendants in that case, however, had offered no rebuttal to the plaintiff's claims of inadequate treatment. To some extent the case represented a joint effort by the Partlow residents and the Partlow administration to bring pressure on the Alabama Legislature. Alabama ranked 50th among the states in expenditures per patient and had not qualified for any federal funds. 325 F.Supp. at 784.

A federal district judge in Georgia refused to follow Judge Johnson's decision in an action alleging inadequate diagnoses and treatment at state mental institutions. Burnham v. Department of Public Health, 349 F.Supp. 1335 (N.D. Ga.1972). He called attention to substantial increases in the state funds provided for mental hygiene (p. 1337), to the statutory basis of the D.C.Circuit cases (p. 1339), and (p. 1340) to Judge Burger's caution, in his dissent in Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657, 663 (1966), that a district court was not equipped to resolve the social and economic interests involved.

The *Wyatt* and *Burnham* cases are both under appeal to the Fifth Circuit Court of Appeals, where they have been argued and await decision.

In other cases the right to treatment has been applied to training schools for juveniles. Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354 (D.

R.I.1972); Martarella v. Kelley, 349 F. Supp. 575 (S.D.N.Y.1972). In both *Affleck* and *Martarella,* many of the plaintiff class had not been committed in lieu of criminal prosecution or incarceration. Some of the plaintiffs in *Affleck* had been voluntarily committed by their parents. 346 F.Supp. at 1363. The class of plaintiffs in *Martarella* were PINS (persons in need of supervision), none of whom had committed crimes. With a minimum of discussion and without citation of *Rouse,* the Court in *Affleck* held that the right to rehabilitation was grounded in due process. The Court reasoned that since juveniles were entitled to strict compliance with procedural due process under the decision in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (1967), any deviation from strict procedures before commitment could be justified only by the promise to rehabilitate.

Judge Lasker in *Martarella* recognized that the right to treatment presented the "most difficult legal issue in this case. . . ." He summarizes his discussion of the law with the assertion (349 F.Supp. at 599) that

> [T]here can be no doubt that the right to treatment, generally, for those held in non-criminal custody (whether based on due process, equal protection or the Eighth Amendment, or a combination of them) has by now been recognized by the Supreme Court, the lower federal courts and the courts of New York.

The rationale is based on the *quid pro quo* approach of due process adapted from *Rouse* and Wyatt v. Stickney and the proposition that commitment without treatment becomes punishment for status in violation of the Eighth Amendment as interpreted in Robinson v. California.

In considering whether there is a federal right to treatment here, it is necessary to face the constitutional questions which Judge Bazelon elided in Rouse v. Cameron. The first two questions are not presented. (1) The summary nature of the original commitment in Rouse v. Cameron is not involved here, since there has been no refusal to release any resident. (2) The extended period of confinement is not an issue, for the same reason. (3) The Eighth Amendment protection against "cruel and unusual punishments" is presented. The court must also consider Judge Lasker's statement that due process or equal protection may support the right to treatment.

### Due Process

The due process basis for the right to treatment for the mentally retarded is not as self-evident as Judge Johnson found in Wyatt v. Stickney. As noted above, the extension of the right from situations involving the mentally ill to situations involving the mentally retarded is not ineluctable. Even those commentators who strongly support the rights of the mentally retarded recognize that there are significant difficulties in such an extension. See Murdock, *supra,* 48 Notre Dame Lawyer at 153.

The justification for holding a man acquitted of crime by reason of insanity, and keeping him beyond the maximum possible sentence, must be either treatment or protection of the public or himself. In *Rouse,* where there was no finding of danger to the public or to the petitioner, the Court could impose a duty either to treat or to release. This equation is not so easily balanced on the Willowbrook facts, where release is not the alternative.

There is no constitutional provision which imposes a duty on a state to provide services to its citizens. *Cf.* Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491 (1970):

> [T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.

It may be argued that the state has reneged on a statutory promise of treatment. Both the old and new Mental Hygiene laws specify that the purpose for admission to a state school is care and treatment (Sections 122–124 of the old law and Sections 33.15, 33.25, and 33.27 of the new law, McKinney's Consol.Laws, c. 27). Residents of Willowbrook and their parents or guardians may be entitled to enforce the fulfilment of this purpose in the state courts. In a federal court, the holding should be that failure to accomplish the original purpose gives only a right to release or to what anyone is entitled to receive when confined in a state institution.

There may be a fundamental conflict of interest between a parent who is ready to avoid the responsibility of caring for an abnormal child, and the best interests of the child. Murdock, *supra*, 48 Notre Dame Lawyer at 139–143. A "voluntary admission" on the petition of parents may quite properly be treated in the same category as an "involuntary admission," in the absence of evidence that the child's interests have been fully considered. There may be occasions where a court should appoint a law guardian or a special guardian to represent a child before institutionalization. That issue need not be decided at this stage, however.

There is no doubt that procedural safeguards are necessary before a citizen can be deprived of liberty even when the state's purpose is benign. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). To the extent that the characterization of a person as mentally retarded may involve a public stigma, the initial determination cannot be made without notice and hearing. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Pennsylvania Association for Retarded Children v. Pennsylvania, 343 F.Supp. 279, 293–295 (E.D.Pa.1972).

What constitutes due process under any given set of circumstances must depend upon the nature of the proceeding involved and the rights that may possibly be affected by that proceeding. Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S. Ct. 1743, 1748–1749, 6 L.Ed.2d 1230 (1961). The Supreme Court has not required the full panoply of criminal due process rights in juvenile adjudications because the state's purpose is treatment, not punishment. In re Gault, *supra*; In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

Due process may be an element in the right to protection from harm, but it does not establish a right to treatment.

*Equal Protection*

The plaintiffs assert that they have not been provided with a free public education suited to their needs and capabilities, although their need for such an education is no different from that of other children who are given such an education. This disparate treatment, state the plaintiffs, denies them the equal protection of the law guaranteed by the Fourteenth Amendment.

The Equal Protection clause of the Fourteenth Amendment gives no substantive rights (with the possible exception of the one man-one vote rule). Rather, it mandates that state law not discriminate against classes of similarly situated persons without having a rational basis for so doing. In recent years the Supreme Court has added a refinement to the scrutiny of equal protection claims. If the classification is suspect (*e. g.*, based on race) or if it infringes fundamental rights (*e. g.*, freedom of speech), there must be strict judicial scrutiny and the scheme may be justified only by the state showing a compelling interest in maintaining it.

The plaintiff class has not been singled out by use of suspect criteria. Nor does the alleged denial of a public education infringe a fundamental right. Until recently the question whether edu-

cation was a fundamental constitutional right was unsettled. Some lower court decisions supported the plaintiffs' argument that it was. Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971); Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (3-judge court) (W.D.Tex.1971). However, the Supreme Court, on March 21, 1973, reversed the three-judge court in *San Antonio Independent School District*, holding that although education is one of the most important functions of state and local governments, it is neither explicitly nor implicitly guaranteed by the Constitution. 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16.

The *San Antonio Independent School District* case involved a constitutional challenge to the method of financing public education in Texas which is based on local *ad valorem* real property taxes. The system of financing permitted a large per pupil expenditure discrepancy between a wealthy district which spent $594 and a poor district which spent $356. At 93 S.Ct. 1285–1286. The plaintiff class argued that the system denied it equal protection of the law because its members, largely Mexican-American and black who came from disadvantaged backgrounds, were not provided with an education equal in quality to that available in more wealthy school districts. The Supreme Court held that the challenged Texas system of school finance was not so irrational as to be invidiously discriminatory. At 93 S.Ct. 1308.

█ It would appear that if there is no constitutional infirmity in a system in which the state permits children of normal mental ability to receive a varying quality of education, a state is not constitutionally required to provide the mentally retarded with a certain level of special education. Furthermore, even in a case which found the Minnesota property tax system of financing public education to be unconstitutional, it was recognized that the state had no duty to respond to the needs of individual pupils. Van Dusartz v. Hatfield, 334 F.Supp.

870, 877 (D.Minn.1971), citing McInnis v. Shapiro, 293 F.Supp. 327, 336 (N.D. Ill.1968) (3-judge court), aff'd sub nom., McInnis v. Oglivie, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 (1969).

That plaintiffs have not been unconstitutionally discriminated against is supported by several other cases. In McMillan v. Board of Education, 430 F. 2d 1145, 1149 (2d Cir. 1970), Judge Friendly stated that

[I]f New York had determined to limit its financing of educational activities at the elementary level to maintaining public schools and to make no grants to further the education of children whose handicaps prevented them from participating in classes there, we would perceive no substantial basis for a claim of denial of equal protection.

A recent Ninth Circuit case held that the City of San Francisco did not violate the Equal Protection clause by failing to provide students of Chinese ancestry with compensatory instruction in English. Lau v. Nichols, 472 F.2d 909 (decided Jan. 8, 1973). To the same effect is Morales v. Shannon (W.D.Tex.1973, 41 L.W. 2452).

Mills v. Board of Education of District of Columbia, 348 F.Supp. 866 (D. D.C.1972) supports plaintiffs' position. However, the *Mills* case was based on the District of Columbia Code and the Board of Education regulations as well as the due process clause. Moreover, Judge Waddy there relied on Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1968), which involved the desegregation of district schools. To the extent that *Hobson* went beyond discrimination against blacks, it is at odds with *San Antonio Independent School District, supra.* Lastly, the defendants in *Mills* admitted (348 F.Supp. at 871) that they were under a duty to provide the mentally handicapped plaintiff class with a public education suited to their needs, but asserted that they would need additional funds from Congress. In The Pennsylvania Assoc. for Retarded Children v. Pennsyl-

**764**

vania, 343 F.Supp. 279, 290 (E.D.Pa. 1972), likewise all the defendants except one school district consented to a settlement stipulation.

■ New York has a complicated statutory framework for providing education to the children of the state—both normal and handicapped. The level and quality of education provided to the mentally retarded does not approach what the plaintiffs assert is necessary. To meet the varying demands, New York must allocate finite resources among many worthwhile and necessary programs. It has done so in a rational manner. Having recognized a need, there is no constitutional duty to supply the need in full. Dandridge v. Williams, *supra*, 397 U.S. 471, 90 S.Ct. 1153, 25 L. Ed.2d 491.

■ The allocation of state resources among conflicting needs is a matter for the state legislature, if there is a rational basis and other constitutional rights are not violated. Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Fullington v. Shea, 320 F.Supp. 500 (D.Colo.1970), aff'd, 404 U.S. 963, 92 S.Ct. 345, 30 L. Ed.2d 282 (1971).

Plaintiffs' constitutional rights must rest on protection from harm and not on a right to treatment or habilitation.

#### (b) *The Right to Protection from Harm*

■ Persons who live in state custodial institutions are owed certain constitutional duties by the state and its officials. In recent years there has been a great increase in the number of federal court cases involving inquiries into the conditions in state penal institutions and recognition that the federal Constitution does not cease to protect a man when he enters prison. See generally Turner, Establishing the Rule of Law in Prisons: A Manual for Prisoners' Rights Litigation, 23 Stan.L.Rev. 473 (1971); Hirschkop and Milemann, The Unconstitutionality of Prison Life, 55 U.Va.L.Rev. 795 (1969).

With respect to persons confined under the criminal law, the standard has been succinctly stated by Circuit Judge Kaufman that

A tolerable living environment is now guaranteed by law.

Book Review, 86 Harv.L.Rev. 637, 639 (1973), citing Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), on remand, 321 F.Supp. 127 (N.D.N.Y.1970), aff'd in part and rev'd in part, 460 F.2d 126 (2d Cir.), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972).

■ The cases dealing with prison conditions reflect a balance between the requirements of humane treatment and the necessary loss of rights which follows incarceration for a criminal offense. *E. g.*, Wright v. McMann, *supra*. Institutionalization for any reason involves some restrictions. However, since persons residing in state institutions other than prisons may not be constitutionally "punished" (Robinson v. California, *supra*), some conditions tolerated in prisons may not be permissible in other institutions. Lollis v. New York State Dep't of Social Services, 328 F.Supp. 1115, 1118 (D.C.1971), *modifying*, 322 F.Supp. 473 (S.D.N.Y.1970).

■ Since Willowbrook residents are for the most part confined behind locked gates, and are held without the possibility of a meaningful waiver of their right to freedom, they must be entitled to at least the same living conditions as prisoners. The rights of Willowbrook residents may rest on the Eighth Amendment, the due process clause of the Fourteenth Amendment or the equal protection clause of the Fourteenth Amendment (based on irrational discrimination between prisoners and innocent mentally retarded persons). It is not necessary now to determine which source of rights is controlling.

■ One of the basic rights of a person in confinement is protection from assaults by fellow inmates or by staff. Gates v. Collier, 349 F.Supp. 881 (N.D. Miss.1972); Hamilton v. Love, 328 F.

Supp. 1182 (E.D.Ark.1971); Holt v. Sarver, 309 F.Supp. 362, 384 (E.D.Ark. 1970), aff'd, 442 F.2d 304 (8th Cir. 1971). Another is the correction of conditions which violate "basic standards of human decency." Brenneman v. Madigan, 343 F.Supp. 128, 133 (N.D.Cal.1972).

Prisoners may not be denied medical care, although mere negligence in treatment or differences of individual opinion do not give rise to a federal civil rights claim. Corby v. Conboy, 457 F.2d 251 (2d Cir. 1972). They are entitled to an opportunity to exercise and to have outdoor recreation. Hamilton v. Schiro, 338 F.Supp. 1016, 1017 (E.D.La.1970); Brenneman v. Madigan, *supra*, 343 F. Supp. at 133. As indicated above, they are entitled to adequate heat during cold weather, and to the necessary elements of basic hygiene. LaReau v. MacDougall, 473 F.2d 974 (2d Cir. 1972); Campbell v. Beto, 460 F.2d 765, 768 (5th Cir. 1972).

The recitation above may not exhaust the rights to which the federal constitution entitles residents of a place like Willowbrook. At the present time it is not necessary to set forth a full catalogue of rights, but only to hold that there is support for the extent of relief hereinafter described.

There is some imprecision in a test which requires a determination of the harm against which an inmate must be protected, or "civilized standards of humane decency" or the level of a "tolerable living environment" or the conditions which "shock the conscience" of the court. However, these are the standards that have been applied in determining constitutional rights.

### (c) *Eleventh Amendment*

The point at which an action against a state official for failure to conform to federal law [Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908)], becomes a suit against the state is imprecise. Although the state is not a formal party to these actions, the bar posed by the Eleventh

Amendment may still apply. Ford Motor Co. v. Dep't of Treasury of Indiana, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). In practical terms, the Eleventh Amendment is not a jurisdictional impediment here, but it may affect the scope of relief. However, under the facts in this case, money is not an obstacle to the defendants doing what the court intends to direct. For this reason, defendants' citation of Rothstein v. Wyman, 467 F.2d 226 (2d Cir. 1972) is inapposite.

At this stage, it is not necessary to meet the problem recently discussed by Judge Friendly, whether allocation of limited public funds among retarded children and other children involves an essentially political question. Friendly, "The Law of the Circuit" and All That, 46 St.John's L.Rev. 406, 410 (1972). Likewise, it is unnecessary to consider the scope of federal court decisions which impose additional expenditures on state agencies in order to remedy unconstitutional activities. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Holt v. Sarver, 442 F.2d 304, 306–307 (8th Cir. 1971); Rozecki v. Gaughan, 459 F.2d 6, 8 (1st Cir. 1972).

For all practical purposes, the state must ultimately meet the requirements of the Department of Health, Education and Welfare or lose the substantial federal assistance which is granted for the care of the mentally retarded. The relief granted here is substantially less than what the HEW regulations will ultimately require.

### *Federal Statutory Rights*

Plaintiffs assert that there is a federal interest in the case because of Congressional programs to return retarded persons to useful lives in the community (42 U.S.C. §§ 2670–2677c), and because of provisions in Title XIX of the Social Security Act concerning grants to states for medical assistance programs (42 U.S.C. § 1396 et seq.).

Since there are provisions for federal policing of programs aided by federal funds, any consideration of statutory rights should await either the joinder of the United States Department of Health, Education and Welfare as a party, or at least some opportunity to the Department to participate. Catholic Medical Center v. Rockefeller, 305 F.Supp. 1256, 1268 (E.D.N.Y.1969), vacated, 397 U.S. 820, 90 S.Ct. 1517, 25 L.Ed.2d 806 (1970), aff'd, 430 F.2d 1297 (2d Cir. 1970), app. dism., 400 U.S. 931, 91 S.Ct. 246, 27 L.Ed.2d 262 (1970).

### (d) Abstention

Almost all discussions of the abstention doctrine begin by referring to Chief Justice Marshall's *obiter dictum* in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821), that a federal court may not constitutionally decline to exercise jurisdiction if jurisdiction exists. The commentaries then uniformly state that even if Chief Justice Marshall was correct in 1821, no such rule exists today.

 The modern exposition of the doctrine is found in Justice Frankfurter's opinion for the Court in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Simply stated, a federal court of equity, according to the doctrine, should abstain from adjudicating the constitutionality of a state statute when a state court, given the chance, might so construe the statute as to avoid the constitutional question. The doctrine calls for a judicious exercise of discretion, enabling the federal courts to

> restrain their authority because of "scrupulous regard for the rightful independence of the state governments" and for the smooth working of the federal judiciary. (Citations omitted). This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority

without the need of rigorous congressional restriction of those powers. 312 U.S. at 501, 61 S.Ct. at 645.

The doctrine seeks to supply two demands: (1) harmonious federal-state relationships, and (2) economical employment of federal court resources. Its vitality over the years has been subject to ebb and flow. Judge Kaufman in Reid v. Board of Education, 453 F.2d 238 (2d Cir. 1971), suggests that while abstention by the federal courts was confined within narrow limits during the two decades of the Warren Court, the tide moved the other way during 1970 and 1971. The two late cases cited in *Reid* were Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), and Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). A case decided last term, Lake Carriers' Assoc. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972), must also be considered. Those three cases restate the principles which must be applied in deciding whether abstention is proper.

 Abstention is still described in *Lake Carriers* as appropriate only in narrowly limited special circumstances. 406 U.S. at 509, 92 S.Ct. at 1756. Abstention is an equitable doctrine requiring the balancing of various factors and the exercise of sound discretion. Among the interests to be weighed against impinging on the federal-state relation are the importance of the right alleged to be impaired and the harm inflicted by delay attendant on postponing adjudication while state courts consider the same matter. Harman v. Forssenius, 380 U.S. 528, at 537, 85 S.Ct. 1177 at 1183, 14 L.Ed.2d 50 (1965). Harman v. Forssenius was cited with approval in the *Lake Carriers* case, 406 U.S. at 511, 92 S.Ct. at 1757. Abstention is not justified simply because the federal claim might be presented to the state courts. Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). But where the state claim and federal

claim are not the same, so that determination of the state claim may obviate the necessity of deciding the federal claim, abstention may be appropriate. Askew v. Hargrave, 401 U.S. 476, 91 S. Ct. 856, 28 L.Ed.2d 196 (1971). However, the state remedy must be available in practice, not only in theory, to justify abstention. Monroe v. Pape, 365 U.S. 167, 174, 81 S.Ct. 473, 477, 5 L.Ed.2d 492 (1961); Askew v. Hargrave, *supra*, 401 U.S. at 478, 91 S.Ct. at 858.

This case differs from the *Pullman* case and most cases where abstention has been ordered, in that it does not involve the constitutionality of a state statute, but only practices by state officials and employees alleged to violate plaintiffs' civil rights. It differs from the *Reid* case in at least two major respects. *Reid* involved the question whether a district judge had properly exercised his discretion in abstaining from a decision. The plaintiffs in *Reid* were at home, and seeking the right to placement in special classes for brain-injured children; they were not in a state institution suffering physical abuse and deprivation.

The defendants state that the instant case presents the paradigm for abstention. They argue that the plaintiffs have significant state court remedies under applicable statutes; that state courts have granted relief; and that the novel federal constitutional questions and the scope of requested relief involve serious encroachment on state functions which should be avoided.

It is clear that the plaintiffs have significant state claims, under both the old and new Mental Hygiene Laws. Justice Titone in Renelli v. Department of Mental Hygiene, Sup.1973, 340 N.Y.S.2d 498, granted relief to a resident of Willowbrook State School in an Article 78 proceeding and directed the entry of an order containing

> a specific program of what the respondents are to do in the way of giving Adrienne the treatment and care needed to afford her the opportunity

to be taught the elementary functions that she is capable of.

He said that placing a person like Adrienne in an institution and then forgetting her with no attempt at treatment was the same as imprisonment. He found that she had deteriorated and become anti-social and withdrawn during her period at Willowbrook, that the changes made at Willowbrook after the press first called attention to its conditions "can best be described as cosmetic, a sop for the press" and that there was "no change of substance," but that the wards were still overcrowded and understaffed.

In Usen v. Sipprell, 71 Misc.2d 633, 336 N.Y.S.2d 848 (Sup.Ct.Erie Co.1972), Justice Walter J. Mahoney directed the Commissioner of Mental Hygiene, the State Commissioner of Education, and the Erie County Commissioner of Social Services to prepare plans for the temporary care and treatment and provisions for education and mental health services over a five-year period for two children who had been denied admission to the West Seneca State School. He declared that the proceeding might proceed as a class action, without citing any of the New York cases on the limitation of class actions.

The New York Court of Appeals has refused to grant class action status where there are individual differences among members of the class, as exist here. Gaynor v. Rockefeller, 15 N.Y.2d 120, 256 N.Y.S.2d 584 (1965); Hall v. Coburn Corp., 26 N.Y.2d 396, 311 N.Y. S.2d 281, 259 N.E.2d 720 (1970).

■ Where there is a real probability of serious physical harm to residents of a state institution, abstention is not required, and federal intervention should not be delayed. Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971); Maxwell v. Wyman, 458 F.2d 1146, 1151, n. 9 (2d Cir. 1972).

■ The extended time and tremendous effort which have gone into this case should not be wasted by remitting

plaintiffs to a questionable state court remedy.

On the other hand, the circumstances justify this court in restricting its preliminary relief to the steps which appear essential for the physical safety of the residents and their protection from gross deterioration. The defendants appear to be making a substantial effort to comply with the requirements of the new Mental Hygiene Law which first became effective on January 1, 1973.

The proposed regulations of HEW, when they become effective, will necessitate a substantial raising of standards, since the state cannot afford to lose the federal funding which is available to an intermediate care facility.

For these reasons, the court will not abstain, but will restrict its relief to the extent indicated below.

*Types of Relief*

■ The court cannot in fairness direct that any of the residents be released before they have been habilitated so far as possible. In fact, none of the plaintiffs have urged this. Nor can the court direct the closing of Willowbrook. As was stated in Employees of Department of Public Health and Welfare, State of Missouri v. Department of Public Health and Welfare, 452 F.2d 820, 827 (8 Cir. 1971), cert. granted, 405 U. S. 1016, 92 S.Ct. 1294, 31 L.Ed.2d 478 (1972):

> The State has no realistic option open to it to discontinue its mental hospitals and training schools forthwith.

The court deems it inappropriate to impose the A.C.F.M.R. Standards or to require all the detailed steps requested by plaintiffs, for the reasons stated above.

It does not follow that the court should avoid imposing detailed requirements, as the defendants assert. Quite apart from the Wyatt v. Stickney cases, federal courts in other situations have found it necessary to prescribe quite detailed provisions for the correction of inadequacies in custodial institutions.

*E. g.*, Jones v. Wittenberg, 330 F.Supp. 707, at 714–721; Inmates of Boys' Training School v. Affleck, *supra*, 346 F.Supp. at 1368–1374.

The basic problems that must be dealt with are the shortage of ward attendants and supervisors, the shortage of physical therapists and recreation staff, the shortage of nurses and doctors, the need for a hospital contract, and the repair of toilets, since these deficiencies affect physical safety and the risk of physical deterioration.

To this end, the court has determined that the following items of relief are appropriate:

1. *A prohibition against seclusion.* The fact that seclusion continued after the Director ordered its termination requires that future violations of his directions be punishable by contempt and not simply by civil service disciplinary procedures.

2. *Immediate hiring of additional ward attendants*, sufficient to assure that during waking hours there will be a 1:9 ratio of staff to residents or better in all facilities housing severely or profoundly retarded or emotionally disturbed residents—the court finding that this is the ratio necessary to provide the degree of care required under the standards set forth above. The court recognizes that addition of numbers does not necessarily assure better treatment, but it relies on the defendants to see that necessary training and supervision is provided, as is likely under the present program of reducing population and providing qualified team leaders.

Defendants argue that additional hiring cannot avoid the results of unauthorized absences. The court cannot accept such a confession of administrative failure. The duty is to protect residents from harm at all times, including weekends, even if it requires the creation of a pool of substitutes or weekend differentials or other innovative practices.

The court recognizes also that a period of training and orientation is neces-

sary for new employees and therefore will grant a little time for this purpose.

3. *Immediate hiring of at least 85 more nurses,* representing about half of the vacant positions—the court finding that this is the minimum number of additional nurses necessary to conform to the standards set forth above. The mix between registered nurses and licensed practical nurses may be determined by the Director.

4. *Immediate hiring of 30 more physical therapy personnel,* to be recruited with a starting salary of at least $12,000—the court finding that this is the minimum number of additional physical therapy staff necessary to prevent physical deterioration of the residents. The salary is fixed at about 10 per cent above the figure which the court has been informed is the level at which present unsuccessful recruiting efforts are proceeding.

The court has been cited to no cases dealing specifically with the power of a federal court to adjust state salaries, but this is a necessary part of the power of an equity court to fashion an effective decree. Otherwise bureaucratic regulations might frustrate the protection of constitutional rights. If salaries which are sufficient to staff institutions off Staten Island are insufficient to bring personnel into Willowbrook, then, as long as Willowbrook remains open, the salaries must be set at a level which will enable the state to fulfil its constitutional obligations.

5. *Immediate hiring of 15 additional physicians*—the court finding that this is the minimum number necessary to conform with the standards set forth above.

6. *Immediate hiring of sufficient recreation staff* to assure that residents will receive an opportunity for indoor and outdoor recreation so far as they are capable of it—the court finding that provision for recreation is necessary to conform to the standards set forth above.

7. *Immediate and continuing repair of all inoperable toilets*—the court finding that this item of basic hygiene is fundamental and is at present not met. With respect to other items of maintenance, the court relies for the present on the evidence of energetic efforts of Deputy Director Eliazarian to meet the needs of the institution, and the hope that other state officials will cooperate with his efforts.

8. *Consummation within a reasonable time of a contract with an accredited hospital* for the care of acutely ill Willowbrook residents—the court finding that Building No. 2 at Willowbrook does not meet the standards of medical care which are required for that purpose and that a contract with an outside institution is the only way to satisfy this portion of the standards set forth above.

9. *Periodic reports* must be made concerning the progress of the defendants in meeting these requirements, and implementing the plans which they have described to the court, and concerning any hindrances by other state officials to their efforts.

Salaries attractive enough to bring people to an institution with the reputation and character of Willowbrook may need general adjustment. The need is clearest with respect to physical therapists. With respect to nurses, there may have been inept recruitment policies in the past rather than salary problems. The court will defer action on the starting salaries of staff other than physical therapists until after the first of the reports from the defendants.

The court has considered the fact that reduction in population at Willowbrook has proceeded at a fairly rapid pace (an additional 122 residents were transferred during the last half of March 1973), and has made its findings with that fact in mind.

The court will not include medical screening in the order, since this relates to the right to treatment rather than to the right to protection from harm. Provision of the additional staff mentioned

above, and a contract with an accredited hospital are deemed to meet the requirements of protection from harm.

The court has been informed that Commissioner Grunberg terminated his state service on March 31, 1973. The order to be entered herein will be binding on his successor. In order to be sure that the successor fill carry out the policies which Commissioner Grunberg has outlined, it may be hoped that he will read the affidavits submitted in this case so that he may be aware of the inhumane and shocking conditions which have heretofore existed at Willowbrook.

An appropriate order embodying these provisions will be entered shortly. The parties will be free to apply to the court for the correction of any statements in this Memorandum or for modification or clarification of any provisions of the Order.