**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al., and Patricia Parisi, et al., Appellees,**

**v.**

**Hugh L. CAREY, Individually and as Governor of the State of New York, et al., Appellants,**

**United States of America, Amicus Curiae.**

**No. 417, Docket 78–6072.**

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1978.

Decided March 1, 1979.

Robert S. Hammer, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, William A. Carnahan, Deputy Commissioner and Counsel, Paul F. Stavis, Deputy Counsel, Margaret M. Corcoran, Atty., Paul Litwak, Deputy Counsel, New York State Dept. of Mental Hygiene, Clarence J. Sundram, Asst. Counsel to the Governor, Albany, of counsel), for appellants.

Michael S. Lottman, Willowbrook Review Panel, Newark, N. J. (Murray B. Schneps, New York City, of counsel), for appellee Willowbrook Review Panel.

Jack Bernstein, Protection and Advocacy System for Developmental Disabilities, Inc., New York City, for appellee New York State Ass'n for Retarded Children, Inc.

Christopher A. Hansen, New York Civil Liberties Union, New York City (Kalman Finkel, Legal Aid Society, Civil Div., John Kirklin, Director of Litigation, Carol Kellerman, Legal Aid Society, Civil Appeals and Law Reform Unit, New York City), for Appellee Class Members.

Before MANSFIELD and OAKES, Circuit Judges, and POLLACK, District Judge.*

OAKES, Circuit Judge:

This appeal, on first view, might be thought to involve the power of a federal court to order a state facility for the retarded to hire additional staff at expense to the public fisc in order to meet court-imposed requirements. Upon further analysis, however, the appeal is from a limited order appurtenant to a rather complex organizational structure for the operation of the facility. The structure itself was established by the parties in a Consent Judgment settling the original proceeding in this litigation after a preliminary injunction granted by the United States District Court for the Eastern District of New York, the late Orrin G. Judd, Judge.[1] That court approved the Consent Judgment[2] after trial had commenced on a claim under Section 1983 of the Civil Rights Act,[3] brought as a class action on behalf of mentally retarded children and adults residing at Willowbrook Developmental Center (Willowbrook), formerly the Willowbrook State School for the Mentally Retarded and now the Staten Island Developmental Center. In the close to seven years that the litigation has been pending, neither party has sought appellate review of the many determinations made by the district court. Here the state officials[4] responsible for the operation of Willowbrook bring the first appeal, involving the question whether the State should provide funding for a few additional staff for the Consumer Advisory Board, one of the advisory bodies established by the Consent Judgment. The state officials challenge the propriety of the order for such provision on the basis that it is contrary to the express terms of the Consent Judgment or constitutes an unreasonable interpretation or modification thereof, is vague and otherwise unenforceable, and requires additional appropriations from the State's treasury in violation of the Eleventh Amendment. We find the arguments unavailing and affirm the judgment of Judge John R. Bartels below.

In order properly to put the order appealed from in perspective, it is necessary to review the history of the litigation, the scope of the Consent Judgment, the operational structure under the judgment, and the district court's factual determinations as to the necessity for the staff.

## HISTORY OF THE LITIGATION

The complaint was filed under Section 1983 on March 17, 1972, the plaintiffs being a group of parents, volunteer organizations, and individual residents at Willowbrook, which at that time had a population of approximately 5,700, officially 65% over capacity, and was the largest institution of its kind in the country. The suit alleged that the conditions at the institution were physically so inadequate and the environment so destructive and dehumanizing that many of the residents had regressed and their condition deteriorated after their admission. The plaintiffs, who are here appellees, requested preliminary injunctive relief involving the hiring of more medical and supporting staff, prohibitions against the use of seclusion and physical restraints, separate bedroom and day areas for the residents, appropriate clothing, and comprehensive medical and hospitalization facilities. In *New York State Association for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 756 (E.D.N.Y.1973), Judge Judd, after

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. *New York State Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 756 (E.D.N.Y.1973).

2. *New York State Ass'n for Retarded Children, Inc. v. Carey*, 393 F.Supp. 715 (E.D.N.Y.1975).

3. 42 U.S.C. § 1983.

4. Appellants include the Governor of New York; the New York State Department of Mental Hygiene; the Commissioner, Deputy Commissioner, and Second Deputy Commissioner of the Division of Mental Retardation and Children's Services of that Department; the Director and Deputy Directors of Willowbrook itself; and others. All are collectively referred to as the "state officials" or "the State" herein.

five days of hearings and on the basis of "a sheaf of exhibits, a folder of photographs, and hundreds of pages of affidavits considered as part of the record," as well as the court's visit to Willowbrook, found that Willowbrook consisted of approximately forty-three buildings with a resident population of 4,727 on December 10, 1972, reduced from 5,700 at the beginning of the action and a high of 6,200 in 1969. *Id.* at 755. Over three-quarters of the residents he found to be profoundly or severely retarded, having intelligence quotients below 35, with approximately one-third suffering from epileptic seizures and over half having been in Willowbrook for more than twenty years. Twenty-seven percent of the residents he found to be there voluntarily, and their treatment did not differ from that given to those there under court order. On the testimony of parents and the affidavits of others, the judge found numerous failures to protect the physical safety of the children and deterioration rather than improvement of their condition, with poor physical maintenance and in effect "conditions . . . hazardous to the health, safety, and sanity of the residents." *Id.* at 756.[5] In a very careful opinion, Judge Judd held that plaintiffs had no constitutional right to treatment based on due process or equal protection but that plaintiffs' constitutional right to protection from harm in a state institution meant that the Willowbrook residents were "entitled to at least the same living conditions as prisoners." *Id.* at 764. The judge found that the plaintiffs did not have such conditions; accordingly, he granted preliminary relief including:

1. A prohibition against seclusion.

. . .

2. Immediate hiring of additional ward attendants . . . . .

3. Immediate hiring of at least 85 more nurses . . . . .

4. Immediate hiring of 30 more physical therapy personnel . . . . .

5. Immediate hiring of 15 additional physicians . . . . .

6. Immediate hiring of sufficient recreational staff . . . . .

7. Immediate and continuing repair of all inoperable toilets . . . . .

8. Consummation within a reasonable time of a contract with an accredited hospital . . . . .

9. Periodic reports [to the court] concerning the progress of the defendants in meeting these requirements . . . . .

*Id.* at 768–69. All requirements were based on achieving conformity with the minimum standards of the Accreditation Council for Facilities for the Mentally Retarded.

Subsequent to the intervention of the United States Department of Justice as amicus curiae in support of the plaintiffs, the latter moved to have several state officials held in contempt, a motion that Judge Judd denied; although he found that the defendants had not complied with his earlier order, he felt unable to allocate blame for the noncompliance. Trial commenced on October 1, 1974; and eight expert witnesses, numerous parents, and analysts from the Department of Justice testified in support of the plaintiffs' case. The case was almost but not quite settled midtrial; trial ended on January 6, 1975, with the defendant Thomas A. Coughlin's predecessor, Robert W. Hayes, the Deputy Commissioner of the New York State Department of Mental Hygiene in charge of Willowbrook, having described the institution as no longer a "major tragedy," as he had previously characterized it, but as still a "moderate tragedy." Settlement negotiations were renewed after a change of administration in state government and continued until April 1975 when both sides signed a Consent Judgment. Judge Judd approved the consent judgment on April 30, 1975, in a short memorandum opinion. *New York State Association for Retarded Children, Inc. v. Carey*, 393 F.Supp. 715 (E.D.N.Y.1975).

---

5. For additional findings, see Judge Judd's memorandum opinion and order granting plaintiffs a preliminary injunction, 357 F.Supp. 752.

## SCOPE OF CONSENT JUDGMENT

The Consent Judgment governs the operation of Willowbrook and the care and treatment of all mentally retarded members of the plaintiff class, that is, all persons who were residents of Willowbrook on the date that the lawsuit was filed. The judgment expressly incorporates an appendix of "steps, standards and procedures" (hereinafter Appendix A) covering twenty-nine single-spaced pages and dealing with twenty-three topics, all designed to secure the constitutional rights of Willowbrook residents to protection from harm. The judgment recites that these

> "are not optimal or ideal standards, nor are they just custodial standards. They are based on the recognition that retarded persons, regardless of the degree of handicapping conditions, are capable of physical, intellectual, emotional and social growth, and . . . that a certain level of affirmative intervention and programming is necessary if that capacity for growth is to be preserved, and regression prevented."

393 F.Supp. at 717, Consent Judgment at 3. The state officials agreed that " 'within their lawful authority' " and " 'subject to any legislative approval that may be required,' " they would " 'take all actions necessary to secure implementation of' " Appendix A as well as " 'all steps necessary to ensure the full and timely financing of this judgment,' " all in a prompt and orderly manner. *Id.*, Consent Judgment at 3–4.

Appendix A of the Consent Judgment describes the phasing in of various improvements with a thirteen-month period for implementation *of many of the steps, standards, and procedures*. These steps, standards, and procedures relate basically to programming, staff, and environment and mandate an "individual plan of care, development and services" for each resident, prepared by an interdisciplinary professional staff after comprehensive testing and evaluation, Consent Judgment at 5; at least six hours of programmed activity per week day, "individually designed and structured to increase the resident's physical, social, emotional or intellectual growth and development," each program including education, recreation, physical therapy, and speech pathology and audiology services,[6] Appendix A at i; regulation of potential abuse such as restraints, labor, aversive techniques, behavior modification, research, and medication, Appendix A, Sections N, P, and Q; specific ratios of attendants, supervisors, and clinical staff to residents, depending upon the condition of the resident, the type of building, and the time of day, *id.* Section C; and living facilities that will afford the residents "privacy, dignity, comfort and sanitation."[7] *Id.* Section B(1).

But beyond the guidelines and requirements for the operation of the institution, Appendix A in Section V(9) provides: "The primary goal of Willowbrook and of the Department shall be to ready each resident, with due regard for his or her own disabilities and with full appreciation for his or her own capabilities for development, for life in the community at large." Moreover, Appendix A specifically calls for the deinstitutionalization of the residents of Willowbrook and their placement in more normal and less restrictive living situations in the community. It is thus provided that "[w]ithin six years from the date of this judgment, Willowbrook shall be reduced to an institution of 250 or fewer beds." *Id.* Section V(1).

## OPERATIONAL STRUCTURE OF WILLOWBROOK

The Consent Judgment established an elaborate organizational structure, said to be unique in the country, for the purpose of ensuring that the defendants complied with the Consent Judgment; the structure specifically reflected the undesirability of requiring court intervention on every issue

---

6. Many of these retarded individuals have serious physical handicaps, including blindness or deafness and inability to walk, talk, care for themselves, or request care from others.

7. It is significant that Willowbrook was so overcrowded and undermaintained that many of its toilet facilities were inoperable.

relating to the enforcement of the judgment, even though the court retained jurisdiction for the purposes of construing, implementing, enforcing, or considering motions to amend the Consent Judgment.

The first and most important body established under the Consent Judgment is the Willowbrook Review Panel (the Review Panel). Approximately one-half of the provisions of the final judgment itself, as opposed to Appendix A, relate to the composition, duties, and operation of the Review Panel. The Review Panel consists of seven persons, three chosen by the plaintiffs and approved by the court, two chosen by the defendants and approved by the court, and two recognized experts in the field of mental retardation, one of whom is experienced in the management and operation of public institutions for the mentally retarded and the other in the establishment and operation of community facilities and care and placement of mentally retarded persons in them,[8] chosen by agreement of the parties and approved by the court or appointed by the court from the parties' nominations in the absence of agreement. Broad responsibility for monitoring compliance with the terms of Appendix A is delegated to the Review Panel. It is to have a staff; and the Review Panel members and the staff are to have monthly compensation plus reimbursement for "reasonable out of pocket expenses" incurred in performing the duties of the Review Panel, Consent Judgment at 6, appropriate office space, clerical staff, and other support services and equipment. The Consent Judgment requires the responsible officials and department heads or supervisors at Willowbrook to submit written reports to the Director of Willowbrook and to the Review Panel showing in detail the progress toward implementation of the judgment within the building unit or department supervised. The Review Panel staff is periodically to compile written reports showing the degree of progress. The Review Panel is allowed access to all information and buildings, as well as to all employees and members of the class; and interference with the Review Panel is punishable as contempt.

It is important to note that the Review Panel is required, by majority vote, periodically to make "written recommendations to defendants of steps deemed necessary to achieve or maintain compliance with the provisions of this judgment," including recommendations as to timetables as well as substantive recommendations. *Id.* at 8. The Review Panel is also to recommend resolution of disagreements concerning the interpretation or application of the steps, standards, and procedures in Appendix A. It is provided that "all parties to this judgment shall be bound by and shall implement the recommendations of the Review Panel" unless within fifteen days a party objects in writing to the recommendations and serves the objections upon other parties to the litigation. It is further provided that upon receipt of written objections the Review Panel may apply to the court for an order implementing the recommendations to which objection has been taken. Indeed, the very recommendation here involved is one that the Review Panel made, to which the state officials objected, and for the implementation of which the Review Panel applied to the court for an order allowing it to proceed.

Thus it can be seen that the parties knowingly and intentionally delegated to a panel of chosen experts the power to make

---

**8.** The Review Panel members are Dr. James D. Clements, Director of the Georgia Retardation Center (Atlanta, Georgia) and member of the President's Committee on Mental Retardation, Chairman; Murray B. Schneps, New York City attorney and father of a named plaintiff, Vice Chairman; Dr. William L. Bitner, III, president of a bank in Glens Falls, New York, and former Associate Commissioner, New York State Department of Education; James Forde, Deputy Administrator, San Diego County (California) Health Care Agency and former official in the New York State Department of Mental Hygiene; Linda L. Glenn, Assistant Commissioner for Mental Retardation Services, Massachusetts Department of Mental Health; Michael S. Lottman, Director of the Education Law Center, Inc. (Newark and Philadelphia); and David Rosen, Interim Director, Plymouth (Michigan) Center for Human Development, and Associate Administrator, Michigan Department of Mental Health.

the initial determination on important matters involving the meaning and interpretation of the Consent Judgment and Appendix A and more particularly the power to apply for enforcement of such recommendations.[9] The record indicates that the Review Panel has made twenty-two recommendations since its inception. Acting upon a request of the Review Panel, the district court issued one order particularly construing the recommendatory provisions of the Consent Judgment even as it also ordered the implementation of certain substantive Review Panel recommendations regarding the removal of 140 persons from educational programming, the extension of psychiatric services, the development of a medical services plan, and the inclusion as class members of those nonresident individuals already placed in the community as of the commencement of the litigation. This order, issued by Judge Bartels, provided that

> the formal recommendations of the Review Panel, except on issues dealing with points of law only, shall be deemed prima facie proper and correct, and the party objecting to all or any part of a formal recommendation must, simultaneously with such objection, demand in writing a hearing before the Court, at which such objecting party shall have the burden of coming forward and showing that such formal recommendation is improper.

*New York State Association of Retarded Children, Inc. v. Carey,* No. 72 Civ. 356 (E.D.N.Y. Feb. 8, 1977). If the objector meets the burden of coming forward, the Review Panel has the burden of establishing by a preponderance of the evidence the correctness and propriety of the recommendation.

The Consent Judgment, as elaborated on in Appendix A, also sets up a Consumer Advisory Board (CAB) and a Professional Advisory Board (PAB). The CAB, the staff of which is the subject of this appeal, is intended to provide input from the perspective of the residents and their families, persons not professionally involved in the operation of retardation programs. It consists of seven members including "parents or relatives of residents, community leaders, and residents or former residents."[10] Consent Judgment at 23. The CAB participates in the development of Willowbrook's philosophy, goals, and long-range plans; evaluates allegations of dehumanizing practices or other violations of individual or legal rights of the residents; and designates a member of the committee that passes upon requests to conduct aversive conditioning, behavioral research, or experimentation. The CAB's most important function is to act *in loco parentis* on behalf of residents whose interests are not actively represented by a parent, relative, legal guardian, or committee. These residents, known as "noncorrespondents," have no one to protect their inter-

9. Appendix A gives the Review Panel serious other responsibilities and duties: Section D(4) requires Review Panel participation in the establishment of procedural mechanisms for appeal by a resident, parent, or guardian who disagrees with a resident's individual development plan; Section W(3), approval of hearing procedures for transfers from Willowbrook to another residence; Section E(2), review and approval of a staff orientation and training program; Sections S(2) and S(4), nomination of the members of the Professional and Consumer Advisory Boards which under Sections S(1) and S(3) are periodically to submit written reports to the Review Panel; Section W(5), evaluation of and recommendations concerning the appropriateness of using one particular state facility as a residence for class members; and Section V(6), preparation of and recommendation for implementation by defendants of a detailed, comprehensive "community placement plan" to meet the needs of class members for appropriate, deinstitutionalized residential settings. Appellees advise this court that the Review Panel has fulfilled all of these responsibilities.

10. The CAB presently consists of Elliot Aronin, Chairman, a certified public accountant who is a past president of the New York State Association of Retarded Children; Jerome Isaacs, a business executive and father of a named plaintiff; Anthony Pinto, a retired fire captain and president of the Benevolent Society, the parents' group at Willowbrook; Ida Rios, a teacher and parent of a named plaintiff; Hugh O'Donnell, a retired court official and a member of the board of the Benevolent Society; and Richard Surpin, codirector of a community organizing and planning project. At the time of this appeal, the CAB was one member short.

ests or to represent them in connection with the various steps, standards, and procedures under Appendix A, especially the creation of an individual developmental plan and community placement. The CAB or its designee thus acts as the noncorrespondent's parent or relative. There are approximately six or seven hundred noncorrespondents who now reside in all parts of the state, and it is in order to carry out these *in loco parentis* duties that the CAB requested the additional staff assistance that is the subject of this appeal.

The PAB is also a source of outside input to the state officials operating Willowbrook, but it consists obviously of people who are "eminent professionals in relevant fields." Appendix A, Section S(4). Their duties include advising on professional programs and plans, budget requests and objectives, and investigation of alleged dehumanizing practices and violations of human or legal rights. The PAB must approve exceptions to certain of the required standards, steps, and procedures and like the CAB must approve aversive conditioning, behavioral research, and experimentation.

It is interesting to note that of the Review Panel's twenty-two formal recommendations and interpretations since it was fully constituted in July 1975, four have involved closing or keeping closed certain institutions as, for example, the closing within about two years of the Keener facility on Ward's Island, which housed exclusively members of the plaintiff class; the closing within fifteen days of the Hillcrest Unit of the Wassaic Developmental Center, which housed eight class members; and the immediate closing of the Gouvernour Unit of Manhattan Developmental Center, which housed about 160 class members. The Review Panel also recommended prohibiting the use of the Bronx Developmental Center as a residential center for members of the Willowbrook class. Other Review Panel recommendations included the hiring of a medical director at Willowbrook, the provision of educational programming for 140 residents, and the like, all significant matters pertaining to the operation of Willowbrook. Based upon fourteen major audits

by the Review Panel of the degree of compliance by defendants, the plaintiffs-appellees filed a motion for civil contempt against three state officials on November 9, 1976; the parties settled the motion by a stipulation, which recited that there was noncompliance and a need for increased efforts to achieve compliance, and an order which prescribed new duties for defendants such as reviewing all municipal and state building codes and contracting with a private agency to take over five Willowbrook buildings.

The foregoing discussion is necessary to appreciate the limited nature of the order made below. It requires the hiring of five staff persons for the CAB (four professionals, *i. e.,* nonclerical, and one secretary), two of whom have already been retained as "consultants" but are actually working full-time for the CAB.

## DISTRICT COURT FINDINGS

At the hearing before the district court and in a supporting affidavit, Kathleen McKaig, the CAB's coordinator, estimated at 699 the number of noncorrespondent class members for whom the CAB must act *in loco parentis* as above described, including 377 at Willowbrook, 46 at other facilities in Staten Island, 178 in other boroughs, and 98 outside the New York City area, plus 300 other class members whose parents are either out of the state or the country. At the time of the hearing the members of the CAB included one member of the plaintiff class, three parents of class members, two community leaders, and an individual who had just been appointed. With the exception of one member who is retired and thus able to spend forty hours a week at Willowbrook, the members are able to devote only five to fifteen hours per week to CAB activities because they all have full-time jobs. The CAB meets as a body once a month, and its subcommittees also meet on a monthly basis. But according to the district court's findings, "as a practical matter the seven members of the Board . . . cannot be expected to carry out the func-

tions entrusted to them without considerable assistance." *New York State Association for Retarded Children, Inc. v. Carey,* No. 72 Civ. 356 (E.D.N.Y. Mar. 23, 1978) at 12. The coordinator reviews reports of abuse and neglect at Willowbrook, but there is no one to do the same for class members at facilities in other boroughs or upstate. Twelve to fourteen hours of staff time is required for each transfer to community placement, amounting to about ninety hours per month for a total of eighty-six transfers so far proposed; but as the number of community transfers increases this figure will increase. An additional 180 hours per month of staff time is spent following up on the community placement of noncorrespondent class members, the goal being to visit each noncorrespondent once every three months and to spend two to four hours per visit with the resident unless there are serious problems requiring more time. The staff of three is presently available to visit about twenty residents per month each.

Moreover, on a daily basis the CAB should be attending an average of four individual development plan conferences, but as presently constituted the CAB is actually able to attend only a third of the conferences and has not been able to serve at all the class members residing upstate; even at Willowbrook itself the CAB is able to attend only half of the conferences, and there was evidence that preparation for the conferences was not as thorough as it should be. Two typical case reviews are appended hereto as an appendix to indicate the nature and scope of each person's problems. Judge Bartels found that "[t]he basic responsibilities of the additional staff would be to permit the CAB to carry out its *in loco parentis* responsibilities with respect to all of the roughly 700 noncorrespondent class members." *Id.* at 6.

The Department of Mental Hygiene rejected the Review Panel's recommendation for additional CAB staff alleging that the CAB had an inflated view of its functions under the Consent Judgment, that the staff would duplicate the efforts of other supervisory bodies, that the Consent Judgment did not require the State to provide staff for the CAB, that the Review Panel had no authority to recommend staff because the Consent Judgment did not provide for CAB staff, and that court enforcement of the recommendation would go beyond the scope of the State's consent to the judgment and require expenditures from the state treasury in violation of the Eleventh Amendment.

Judge Bartels found that the argument that the CAB had an exaggerated view of its general functions had "very little persuasive force" because the CAB's jurisdiction is "quite extensive." *Id.* at 7–8. He particularly cited the power of the CAB to evaluate dehumanizing practices and violations of civil rights which necessarily included the power to investigate as well as to coordinate. In any case he found undisputed the testimony of the CAB coordinator that the CAB and its present staff are not completely performing even the precisely specified *in loco parentis* functions. He found in this connection that the CAB is trying to do what the court "would require of it under any circumstances," *id.* at 9, involving a thorough job knowing the individual noncorrespondent and his or her developmental plan. The State argued that the CAB had failed in its " 'mission . . to organize local parent advocacy groups,' " *id.,* such as the one that has worked well at the Rome Development Center; but Judge Bartels found that there was no such mission under the terms of the Consent Judgment, although the CAB's authority to develop and rely on volunteer groups could be inferred. Under Appendix A, in fact, Willowbrook itself was to expand the volunteer programs, and the state officials were to apply for federal funding for a foster grandparent program. Although the CAB would appropriately assist in developing these programs, Judge Bartels noted that the CAB's lack of reliance on volunteer groups was not a ground for denying additional staff. As to the State's complaint that the CAB members overrely on staff, doing very little of the investigation themselves and delegating the responsibility for

attending individual case conferences instead of themselves attending, the judge found that the members, all but one of whom are employed fulltime, could not be expected to carry out the CAB functions without considerable assistance. The judge also rejected the state officials' argument that the various other legislative bodies that have supervisory duties over the conditions at Willowbrook would make any expansion of the CAB staff unnecessary; because none of these bodies has the specific *in loco parentis* responsibilities of the CAB and none of them is responsible to the court, Judge Bartels found that there was no duplication of effort.

The judge further found that the cost of compliance by the State would be approximately $130,000 per year. This figure is about one-third of one percent of Willowbrook's annual budget of $41 million, although still not a completely insignificant amount when viewed in light of New York State's overall budgetary problems of recent years.

A recitation of the above findings, none of which the State argues is not supported by sufficient evidence, leads us to a review of the judge's legal rulings. Judge Bartels ruled on alternative grounds, limiting himself on the first to construction of the Consent Judgment as written under the "four corners" rule enunciated in *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *see also United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). The judge thus held that the provision of the Consent Judgment requiring the State to pay the CAB's "reasonable expenses" included reasonable expenses necessary for carrying out the CAB functions and that because he found the staff necessary to the CAB's carrying out its functions "reasonable expenses" included staff expenses. He held alternatively, however, that the evidence adduced would justify a modification of the Consent Judgment if appellees had properly brought a motion to modify; the judge relied upon a court's inherent power under *System Federation No. 91, Railway Employees' Depart-*

*ment v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), and *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), to modify the Consent Judgment because of the court's continued supervision over the implementation of the judgment. *See also King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31 (2d Cir. 1969).

The judge also rejected the defense that the Eleventh Amendment barred the relief that the plaintiffs sought. He ordered and enjoined the state officials to take all action necessary to secure implementation of the Review Panel's recommendation, within their lawful authority and subject to any legislative approval that may be required, and to take all steps necessary to ensure the full and timely financing of the recommendation including, if necessary, submission of appropriate budget requests to the legislature.

## DISCUSSION

The State first argues that the court misinterpreted the Consent Judgment by treating expenses for staff as "reasonable expenses" of the CAB for which reimbursement is required. The plaintiffs-appellees do not seriously dispute the State's argument in this respect, and we incline to accept it: the reasonable expenses contemplated are the expenses of the individual members in carrying out their own functions and do not involve the hiring of staff. Nor do we reach the trial court's alternative holding that (1) the Review Panel's recommendation can be treated as a motion to amend the Consent Judgment and (2) the findings at the hearing would satisfy the requirement of a hearing on such modification. The Consent Judgment spells out the procedure for modifying the judgment itself, and that method was not followed here.

Rather, we rely on an interpretation of the Consent Judgment itself but one that is broader than the State's. This Consent Judgment was, as we have attempted to explicate above, complex and ongoing in

nature. The judgment contemplated changing conditions. It was inevitable that situations would arise that the terms of the judgment, however specific, did not address and that implementation of the judgment would require further refinement of the terms. But the parties did not contemplate frequent resort to the court to interpret the meaning of and ensure compliance with the Consent Judgment. Instead, they created continually evolving enforcement and supervisory mechanisms, including the Review Panel, the CAB, and the PAB, in order to take such changed conditions into account and to assure respect for the constitutional rights of the Willowbrook residents and noncorrespondents. The elaborate system established to meet evolving conditions and to resolve differences, together with the supervisory and recommendatory role of the Review Panel, requires a degree of flexibility in enforcement of the judgment that does not result in a modification; the flexibility is within "the four corners" rule of *Armour, supra,* because the Consent Judgment itself provides for it. The Consent Judgment is no mere contract, even though reference to contract principles may be useful. *United States v. Swift & Co., supra,* 286 U.S. at 115, 52 S.Ct. 460. We may look at "the circumstances surrounding the order and the context in which the parties were operating," *United States v. ITT Continental Baking Co., supra,* 420 U.S. at 243, 95 S.Ct. at 938, without in any way departing from the "four corners" rule of *Armour, see id.* 402 U.S. at 238, 91 S.Ct. 1752.

■ The "steps, standards and procedures" language in the Consent Judgment specifically permits the Review Panel to recommend additional steps where necessary to achieve or maintain compliance with the provisions of the Consent Judgment. The authority to make recommendations appears to us to be a well-constructed mechanism for flexible yet orderly and effective implementation and dispute resolution. These recommendations are especially appropriate where, as here, at the time that the parties signed the judgment it would have been extremely difficult to know the scope of the CAB's duties, the number of residents on whose behalf they would have to act, and how effective the CAB would be. Under the express findings of the district court, the CAB in order to function according to the terms of the Consent Judgment must have this limited amount of staff. We believe that the Consent Judgment authorized the Review Panel's recommendation as an exercise of the prospective, independent, and creative powers that the judgment accorded to the Review Panel. Even if the provision requiring the State to pay the reasonable expenses of the CAB members does not include expenses for staff, the provision authorizing the Review Panel to recommend steps to implement the judgment does include such expenses; and we can thus derive our construction of the Consent Judgment as requiring the payment of these expenses strictly from within the four corners of the judgment itself.

It is interesting that the parties have also construed the Consent Judgment to permit wide-ranging Review Panel recommendations and flexibility in the interpretation of the means of compliance. Not only has the Review Panel made formal recommendations and interpretations, but it has made a number of informal ones also; yet the threat of the contempt power has been used in aid of enforcement hardly at all. The advice, intervention, and assistance of the Review Panel has been of utmost importance in the ongoing attempt to implement the Consent Judgment. Indeed, in terms of the CAB itself, as its responsibilities were more precisely defined and expanded by experience, the State agreed (albeit under protest) to pay the salaries for a coordinator and a secretary; it later agreed to allow the CAB to hire two consultants. *See also United States v. Atlantic Refining Co.,* 360 U.S. 19, 22, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); *Sanchez v. Maher,* 560 F.2d 1105 (2d Cir. 1977).

■ We agree with the district court that the absence of an explicit reference to "staff" in the provisions of the Consent Judgment relating to the CAB is not fatal to the recommendation; rather the absence

indicates, as Judge Bartels found, that the parties did not have a "fully comprehensive conception of how to deal with the problems the CAB would face." [11] The evolutionary and creative powers of the Review Panel agreed upon in the Consent Judgment, coupled with the affirmative acts of the parties defining the role of the CAB that made staffing necessary, mandate enforcement of the Review Panel's recommendation for CAB staff. In short, we treat the organizational structure established under the Consent Judgment—a Review Panel with the power to recommend interpretations of the judgment and methods of implementing it—as analogous to the powers granted, say, to Congress under Section 5 of the Fourteenth Amendment to effectuate the matters of substance and procedure contained in the first four sections of that amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–56, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). That is to say, there is a self-executing mechanism for flexibility built into the Consent Judgment, the operation of which, as the court below found, was clearly reasonable in this case and is entitled to be upheld. Judge Bartels' order enforcing the recommendations of the Review Panel was, in this light, certainly not clearly erroneous. The fact that we reached the same result through somewhat different reasoning does not preclude us from affirming his decision. *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937); *Lum Wan v. Esperdy*, 321 F.2d 123, 125–26 (2d Cir. 1963). Under Judge Bartels' earlier interpretive order, when the Review Panel so recommended, it established a prima facie case of such need. Without indicating expressly that the State had failed to produce sufficient evidence to meet that prima facie case, the district court nevertheless made it quite clear that the Review Panel had sustained its burden of persuasion in showing

that the CAB needed the staff in order to implement the judgment and secure the constitutional rights of hundreds of retarded persons.

The State's second objection on appeal is that the district court's order is vague and unenforceable and lacks compliance with Fed.R.Civ.P. 65(d). *See also Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). The state officials are concerned, they allege, because the district court has provided no guidance as to what specific actions they are to take after their request to the legislature for appropriations and whether, if the request is unsuccessful, what further action would be sufficient. But at the same time the State points out that a number of options appear to be available to comply with the order, including requests in the supplemental budget under New York Constitution Article 7, Sections 3 and 4. Moreover, the State claims that there are only three potential sources of funds available that it may use to fund CAB staff; the budgets of the other twenty-one developmental centers in the state, funds already designated for programs for the developmentally disabled, or funds from the executive management budget.

We do not think the order lacks specificity. It compels appellants to assure approval and funding for four full-time professional staff positions and one full-time secretarial position for the CAB. The order leaves it to the state officials themselves to determine the exact means by which to implement the order, appropriately wary of superseding state officials in the proper performance of their governmental functions. *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *rev'd on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).[12] In our view,

---

11. The State's contention that the Consent Judgment obligates the members of the CAB to carry out their guardianship responsibilities personally is rebutted by Section W(7) of Appendix A, which recognizes that the CAB may discharge its duties as *in loco parentis* through "designees."

12. Unlike the "Human Rights Committee" that the Fifth Circuit dissolved in *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *rev'd on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978), the Review Panel was not a creature of the district court; rather, the parties in settlement of pending litigation agreed to its creation, duties, powers, and responsibilities.

Judge Bartels properly deferred to the state officials and legislature in the hope that they will meet their constitutional obligations by whatever methods necessary and desirable. The order compels the state officials to use their best efforts to accomplish the injunctive relief granted. *See Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); *Wyatt v. Stickney*, 344 F.Supp. 373 (N.D.Ala.1972), *aff'd sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

Of course, as the district court warned, the defendants may not obtain compliance through the sacrifice of other programs and services for the mentally retarded; but it does not appear conclusively from this record that all moneys in the New York State Office of Mental Retardation and Developmental Disabilities' budget are devoted to the provision of direct services and care for clients, nor does it necessarily appear that reallocating $130,000 from program or facility budgets would inevitably decrease the level or quality of services. The Governor, moreover, who is a defendant, has substantial flexibility in the use of transfer of money from the state treasury and is apparently not limited under New York State Finance Law § 51 in reallocating funds. Finally, the operative language of the court order is essentially a verbatim recitation of portions of the Consent Judgment itself, which the State has to date construed as providing sufficient guidance with respect to implementation and which indeed is language that the State itself helped to draft.

█ The State's argument based on the Eleventh Amendment as applied in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), to bar an award of monetary damages directly out of the state treasury for the purpose of compensating past wrongs is not applicable to this case. Here involved is purely prospective relief applied to meet the requirements of constitutional law. The order challenged here requires no more qualitatively, and a good deal less quantitatively, than the order in *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct.

2749, 53 L.Ed.2d 745 (1977), *see id.* at 289–90, 97 S.Ct. 2749. *See also* O. Fiss, The Civil Rights Injunction (1978) *(passim)*. To bar a federal court decree of this nature because of its incidental fiscal consequences would immunize state officers from the duty of prospective adherence to federal statutory and constitutional requirements. *Cf. Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (award of attorney's fees not prohibited by Eleventh Amendment although payable out of a state departmental budget). *See also, e. g., Todaro v. Ward*, 565 F.2d 48 (2d Cir. 1977). Moreover, the consent judgment itself would constitute a waiver of Eleventh Amendment immunity if we are correct, as we believe that we are, in our construction of it as itself requiring the State to provide CAB staff in accordance with a Review Panel recommendation for staff as necessary to implement the Consent Judgment.

The judgment accordingly is affirmed.

## APPENDIX

Included in the record on appeal are 35 individual habilitation plans and 27 case reviews for residents of the Rome Developmental Center. We attach as an appendix to this opinion two case reviews as typical of those in the record and, we suspect, of the residents at Willowbrook.

FORM 67 MED 2–75

State of New York—Dept of Mental Hygiene

INTER–DISCIPLINARY NOTES

Name of Facility: Rome Developmental Center

Name of Resident: Richard 225

Consecutive No.: 020 621

D.O.B.: 12/16/61     D.O.A.: 8/17/65

*December 14, 1977 CASE REVIEW*

*PRESENT:* Dr. Wilkie, Mrs. Evans, Mr. Beatty, Mrs. Baranowski, Mr. Diorio, Mrs. Curtacci, Mrs. DiAcunto, Mrs. Frick, Mrs. Duell, Mrs. Shortell, and Mr. Premo

*ABSENT:* Mr. Shortell, Mr. [illegible], and Mrs. Smith

*Medical: Current Medications:* Phenobarbital and Phenytoin for seizures—no seizures recorded since 9/30/77. Haldol—behavior problems—occasionally gets upset and self-abusive according to TA I

*Illnesses or medical disorders in past 6 months:* 10/77—Possible TM perforation, 10/77—traumatic lesions in ear canal, 9/30/77—LOMAC, 9/30/77—status epilepticus, 9/77—behavior problem, 8/77—superficial scratches on left sole, 8/77—laceration

*Recommendations:* Continue present medications

*Living Unit:* Richard enjoys attention and is usually well behaved. However he does at times become very self abusive. He crawls around the dayroom, appearing to explore his environment. During this exploration he does climb in and out of chairs, thereby, exhibiting some motor refinement. He appears to be a happy child within his own world and occasionally interacting with other children.

Jon Premo, TA

*Social Service:* Richard is a 15, almost 16, year old boy who was admitted to RDC in 1965 at the age of 3 years—8 months from Washington County. Legal status is Non-objecting. Mental Retardation Diagnosis is 314.60: Profound Retardation, Associated with Prematurity. Dickie's mother, Mrs. Patricia _____, continues to live in Massachusetts. She does not visit her son or correspond with Building 22. Mrs. _____ has been made aware of the possibility of an Interstate transfer as well as the possibility of re-settlement at Wilton and has not responded to related correspondence. The latter move would appear to no longer appear to be a possibility due to the fact that no relatives remain in the Wilton area (see Jan. 1976 correspondence in record from Dale E. Harro, M.D., Deputy Director of the Wilton facility). Worker has the opportunity to visit Dickie frequently. He is a legally blind boy who is unable to walk although he gets around quite well by crawling. He has no speech but will "par-rot" a few words and/or sounds. Dickie has a minimal awareness of his environment and he exhibits very little interest in people, objects or occurrences. He continues to have occasional periods when he is distressed and self-abusive. This behavior is never intentionally directed at others. He is included in all Living Unit Program and Activities and is receiving SSI Benefits.

*Discharge Plan:* Richard requires medical care and habilitative programming to a degree not presently available in the community. Worker feels that, given these circumstances, Richard is appropriately placed on Living Unit 225.

(Sgd.) Patsy Evans, *Social Worker*

*Recreation:* I have stopped seeing Richard on an individual basis. He is still involved in Unit recreation activities and recreation bus rides. Will continue Richard's present programs.

Charlene Baranowski, *Rec. Therapist*

*Food Service:* Diet—soft; height: 150 cm; weight: 37 Kg. Supplement—Poly-Vi-Flor; anti-constipation # 2

Richard is a dependent eater. His eating skills have not improved a great deal. His height and weight have changed very little. There was a loss of .2 Kg. since the last review. There are no recommendations.

Margaret Curtacci, *Dietician*

*School:* Richard's play and social behaviors usually involve balls or noise making activities. He throws a ball (but not aimed at anyone because he is blind). He also enjoys playing with toys that he can hit on the floor or shelves to make noise. Richard "bounces" a ball by dropping it and catching it. Richard likes tactile stimulation such as sand play. Richard can remove all his clothing and can pull up his underpants and slacks from the knee. Richard has a small imitative vocabulary but words usually must be shouted at him and he shouts them back in a definite rhythm and pitch. Richard will respond to other children only when they touch him. He responds well to adults but does not seek attention. He is non-ambulatory, but gets around well by sliding or crawling. He occasionally throws

tantrums during which he throws things and is self-abusive.

*Recommendations:* Richard should attend school in Bldg. 54 as soon as there is an opening for him.

Karen Shortell, *Teacher IV*

*Recommendations:* Continue present medications. Continue present programs.

FORM 67 MED 2-75

State of New York—Dept of Mental Hygiene

INTER–DISCIPLINARY NOTES

Name of Facility: Rome Developmental Center

Name of Resident: Diane 221

Consecutive No.: 019 525

D.O.B.: 12/7/57     D.O.A.: 5/28/62

*December 14, 1977 CASE REVIEW*

PRESENT: Dr. Wilkie, Mrs. Frick, Mrs. Evans, Mrs. DiAcunto, Mrs. Curtacci, Mr. Beatty, Mrs. Comito, Mr. Nadeau, Mr. Dhalle, Mr. Diorio, Mrs. McGregor

ABSENT: Mr. Shortell, Mr. Gifford, and Mrs. Smith

*Medical: Current Medications:* Phenobarbital and Phenytoin for seizures—last recorded seizure 11/16/77.

Ascorbic Acid for gingivitis—reportedly gums still bleed, Mellaril for behavior—behavior good sometimes and not good other times, Chloral Hydrate—sleeping—LPN has not heard recent complaints about her not sleeping.

*Illnesses or medical disorders in past 6 months:* 8/77—hair loss, 7/77—gingival hypertrophy and inflammation, Edema of cheeks, etio?

*Recommendations:* Continue present medications. Increase H.S. medication—Chloral Hydrate.

*Living Unit:* Diane is a profoundly retarded 20-year-old female who is legally blind and non-ambulatory. She is included in all activities with minimal awareness. Diane's feeding program has improved through the use of tongue walking, used to eliminate tongue thrust. She is in a range of motion program daily with O.T./P.T. and Unit staff and has shown little improvement but maintained present status.

Diane frequently appears to be very sleepy during the day and when awake, she often makes noises with loud outbursts.

Helen Smith, *TA*

*Social Service:* Diane is a 20 year old female who was admitted to RDC in 1962 at the age of 4 years—6 months from Herkimer County. Legal status is Non-objecting. Mental Retardation Diagnosis is 314.40: Profound Retardation, Associated with Diseases and Conditions Due to Unknown Prenatal Influence, Not further specified. Diane's mother, Mrs. George _____ continues to live in Old Forge N.Y. She does not visit her daughter or maintain contact with Building 22. Worker has the opportunity to visit Diane on a regular basis. She is a multiply handicapped girl who was declared legally blind in 1975. Diane remains very inactive exhibiting very little awareness of her surroundings. She does not respond to her name or individual attention nor is there any peer interaction. Drowsiness during the day, with wakeful nights, continues to be a problem. Diane is included in all Living Unit Programs and Activities. She continues to receive Social Security Benefits as well as V.A. Benefits.

*Discharge Plan:* Diane requires medical care and habilitative programming to a degree not presently available in the community. Worker feels that, given these circumstances, Diane is appropriately placed on Living Unit 221.

(Sgd.) Patsy Evans, *Social Worker*

*Recreation:* Diane participates in bus and van rides, music and mat therapy, picnics, recreation activities on the ward and recreation room.

Goals—To get response to vestibular stimulation: Method—use of glider, swing, air flow mattress. Increase awareness of tactile stimulation: Method—play with textured objects such as snow, water play, shaving cream and play doe (sic).

Ralph Nadeau, *Sr. Recreation Therapist*

*Food Service:* Diet—fine ground; height—137 cm.; weight—34 Kg. Supplement—Poly-Vi-Flor, anti-constipation program # 2.

Diane is a dependent eater. The tongue walking technique is used in feeding her with a zylon spoon. She has gained 2 Kg. since her last review 6/21/77. There are no recommendations.

Margaret Curtacci, *Dietician*

*School:* Progress is minimal. Diane is extremely lethargic and unresponsive to program intervention.

*Recommendations:* Continue in program.

Paul Dhalle, *Teacher*

*O.T./P.T.:* Diane was evaluated on 12/9/77 for reflex, gross and fine motor development.

*Reflex*—Diane exhibits a negative supporting reaction in standing at the brain stem level and body righting acting on the body and labyrinthine righting acting on the head at the midbrain level. She has no protective extension in sitting but has cortical equilibrium reactions in prone, supine, and sitting.

*Gross Motor*—Basic posture and alignment—Diane has a slight curvature of the spine to the left in the lumbar area. She sits with both legs externally rotated and flexed. Diane is able to raise her head from a prone and supine position (7 mos.) She has head control in sitting. She can roll from prone to supine toward the right (5 mos.) She can maintain a prone on elbows position with stability in bilateral weight bearing, but cannot assume this position. She can get from lying to sitting (10 mos.), sitting to lying and can maintain a tailor and ring sitting position. She can sit steadily for ten minutes, can lean forward and recovers her balance (9 mos.).

*Fine Motor*—Diane is blind—has no blink response, focusing, etc. No grasp reflex is present in the hands; hands are predominantly open (3 mos.). She does not hold anything in her hands.

Diane is positioned in her wheelchair for meals and other activities. In the feeding program we are working to decrease her tongue thrust and get lip closure. She is in the range of motion program.

Judith Belile, *O.T./P.T.*

*Recommendations:* Increase H.S. medication (Chloral Hydrate). Continue other medications. Continue present programs.